*Brian S. Spicuzza v. State of Maryland*, No. 25, September Term, 2025, Opinion by Booth, J.

**PRESERVATION – MD. RULE 4-323 – NECESSITY OF OBJECTIONS**

In this case, the defendant filed a motion in limine to exclude certain evidence, which the circuit court denied. The State argued that the Supreme Court of Maryland should not consider the defendant's contentions of error because defense counsel failed to make proper objections prior to the admission of the evidence at trial. The Supreme Court reiterated the requirements under Maryland Rule 4-323(a) for making contemporaneous objections at the time that evidence is being offered at trial. The Supreme Court also discussed the continuing objection rule, Maryland Rule 4-323(b), which permits a party to request a continuing objection, which is effective "only as to questions clearly within its scope." Applying these rules to the record presented, the Supreme Court held that defense counsel made an adequate objection prior to the first witness who testified about the matter in question. However, the Supreme Court held that the objection to the first witness's testimony was not broad enough to cover the testimony of another witness who testified the following day. Notwithstanding the waiver of a portion of the second witness's testimony, the Supreme Court held that the ultimate issue before the Court—whether evidence of the defendant's alleged misconduct and sexual abuse with the victim's friends was admissible—was adequately preserved for appellate review.

**EVIDENCE – MD. RULE 5-404(b) – COMMON SCHEME OR PLAN EXCEPTION**

Under Maryland Rule 5-404(b), evidence of other crimes, wrongs, or other acts ("other bad acts") is not admissible to prove the character of a person to show action in conformity therewith. The proffering party bears the burden of showing that the evidence is specially relevant to a contested issue in the case other than propensity. In this case, the defendant was on trial for raping and committing other sexual crimes against his minor daughter. The Supreme Court held that the circuit court did not err in admitting other bad acts evidence relating to sexual abuse of his daughter's friends and his providing them with intoxicating substances under the "common scheme or plan" exception in Maryland Rule 5-404(b).

**"WHY-WOULD-SHE-LIE" QUESTION**

The Supreme Court held that the trial court erred in overruling the defendant's objection to the "why-was-she-lying" question that the State asked the defendant during his cross-examination. Although the State asked the question in response to the defendant's improper statement that his daughter made a "vile and false statement," neither question was relevant nor competent. Maryland case law does not permit the admission of incompetent evidence under the "opening the door" doctrine. The appropriate way for the State to have handled the defendant's unresponsive, improper, and inadmissible statement would have been to object and request that the court instruct the jury to disregard the

statement. Although the State's question was improper, the Court determined that the error was harmless beyond a reasonable doubt.

## ADMISSION OF CHARACTER EVIDENCE FOR TRUTHFULNESS UNDER MARYLAND RULE 5-608(a)

The Supreme Court held that the trial court did not err in refusing to allow the defendant to present character witnesses to attest to his honest character. The defendant was not charged with a veracity impeaching offense. Under the plain language and structure of Maryland Rule 5-608(a), a defendant is not permitted to introduce evidence of his general character trait for honesty simply because he or she testified and the State establishes inconsistencies between the defendant's testimony and the testimony of other witnesses. Unearthing inconsistencies as part of a cross-examination is different from establishing that a criminal defendant has a general character trait for dishonesty. Unless a criminal defendant is charged with a veracity impeaching offense, simply being subject to vigorous cross-examination is insufficient to make a criminal defendant's character for truthfulness for purposes of introducing evidence of a general honest character. The Court further held that, even if the State had placed the defendant's character for honesty in question, the trial court did not abuse its discretion in refusing to permit the defendant's witnesses to testify based upon the lack of specificity in the proffers.

Circuit Court for St. Mary's County
Case No.: C-18-CR-22-000283
Argued: December 5, 2025

IN THE SUPREME COURT
OF MARYLAND

No. 25

September Term, 2025

BRIAN S. SPICUZZA

v.

STATE OF MARYLAND

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

Opinion by Booth, J.
Watts, Biran, Gould, and Eaves, J.J., concur and
dissent.
Killough, J., dissents.

Filed: July 28, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

In Maryland, evidence of a defendant's "crimes, wrongs, or other acts," other than those for which the defendant is on trial ("other bad acts"), is generally inadmissible if offered for the purpose of proving the defendant's propensity to engage in criminal or wrongful acts. Md. Rule 5-404(b). Under our exclusionary approach, for other bad acts evidence to be admissible, it must, among other things, have special relevance to some contested issue in the case. Maryland Rule 5-404(b) provides a non-exhaustive list of examples of potential contested issues, such as "proof of motive, opportunity, intention, preparation, common scheme or plan, knowledge, identity, absence of mistake, or accident."

In this case, we are asked to consider whether evidence of other bad acts of sexual abuse was admissible under the "common scheme or plan" exception under Maryland Rule 5-404(b). Petitioner, Brian Spicuzza, was convicted by a jury in the Circuit Court for St. Mary's County on charges of sexual abuse of a minor, rape in the second degree, and sexual offense in the third degree. He appealed his convictions to the Appellate Court of Maryland. That court affirmed his convictions in an unreported opinion.

We granted certiorari to consider whether the trial court erred by (1) admitting other bad acts evidence pursuant to the common scheme or plan exception, (2) allowing the State to erroneously ask Mr. Spicuzza why his daughter—the victim—would be lying about the sexual abuse, and (3) refusing to permit Mr. Spicuzza's character witnesses to testify as to his honest character after Mr. Spicuzza testified and was subjected to cross-examination. In considering these questions, we also address the

State's assertion that Mr. Spicuzza failed to properly object to the introduction of other bad acts evidence at trial.

The rape and sexual abuse for which Mr. Spicuzza was convicted involved his daughter, H., who was 15 years old at the time of trial. The trial took place over five days. The State called six witnesses in its case in chief. One of Mr. Spicuzza's primary contentions on appeal involves the trial court's ruling that permitted H.'s minor friends, A.L. and A.B., to testify about certain alleged crimes involving sexual abuse by Mr. Spicuzza against them, as well as Mr. Spicuzza's conduct in allegedly providing the minors with alcohol, vapes, and marijuana when they visited his apartment. The State sought to admit this evidence pursuant to the "common scheme or plan" exception to Rule 5-404(b), and the trial court admitted this evidence pursuant to that exception. Mr. Spicuzza also contends that the trial court erred in permitting the State to ask him on cross-examination, "why is your daughter lying[,]" about the sexual abuse she alleged Mr. Spicuzza committed against her. Finally, Mr. Spicuzza contends that the trial court erred in refusing to permit him to call character witnesses to attest to his character trait for honesty.

For the reasons discussed below, we hold that the trial court properly admitted the other bad acts evidence under the common scheme or plan exception because it had special relevance to show Mr. Spicuzza's plan to sexually abuse H. and her friends in his apartment. As for Mr. Spicuzza's other assertions of error, we hold that the circuit court erred in permitting the State to ask Mr. Spicuzza to opine on why a witness was "lying." However, we determine that the error was harmless beyond a reasonable doubt.

2

We also hold that the trial court did not err in excluding Mr. Spicuzza's character evidence. Mr. Spicuzza was not on trial for a veracity impeaching offense, and the State's cross-examination of Mr. Spicuzza did not place his character for honesty into question. Moreover, even assuming that Mr. Spicuzza's character for honesty had been called into question, the trial court did not abuse its discretion in refusing to allow the admission of Mr. Spicuzza's character evidence based upon the insufficient proffers. We affirm the judgment of the Appellate Court.

## BACKGROUND

### A. Factual Background[1]

On February 22, 2022, Detective Corporal James Bare of the St. Mary's County Sheriff's Office learned that two minor victims of reported sexual assaults were on their way to the child protective services center. He went there and watched in a separate room as a social worker, Nichole Moneymaker, interviewed the two young women, I.H., and A.L. The interview revealed another potential victim, H.S. ("H."). Detective Bare then contacted H.'s mother, who brought her to the center. Ms. Moneymaker interviewed H., but H. had difficulty engaging, did not disclose anything to Ms. Moneymaker, and denied that her father, Mr. Spicuzza, had done anything improper with her.

On February 23, 2022, Detective Bare obtained and executed search warrants for Mr. Spicuzza's apartment and his person based on I.H.'s and A.L.'s interviews. Mr.

---

[1] The facts presented in this section are based on the testimony and other evidence introduced at trial.

3

Spicuzza was arrested the next day. On the day of Mr. Spicuzza's arrest, H. was interviewed again. In that interview, H. told Ms. Moneymaker that Mr. Spicuzza touched her breasts and vagina, licked her vagina, and asked her for fellatio. Ms. Moneymaker interviewed H. again on May 13, 2022. During that interview, H. revealed for the first time that her father had raped her.

Mr. Spicuzza was indicted for four counts of second-degree rape, one count of third-degree sexual offense, and five counts of sexual abuse of a minor.[2] Before trial, Mr. Spicuzza and the State filed preliminary motions that pertain to some of the evidentiary rulings that are the subject of his appeal. We discuss some of the pretrial proceedings that led to the circuit court's rulings on the admissibility of A.L. and A.B.'s testimony, as well as Mr. Spicuzza's efforts to introduce character witnesses.

---

[2] The State charged Mr. Spicuzza under two of the second-degree rape modalities. These prohibit: (1) engaging "in vaginal intercourse or a sexual act with another . . . if the victim is . . . a physically helpless individual, and the person performing the act knows or reasonably should know that the victim is . . . a physically helpless individual," and (2) engaging "in vaginal intercourse or a sexual act with another . . . if the victim is under the age of 14 years, and the person performing the act is at least 4 years older than the victim." Md. Code, Criminal Law ("CR") § 3-304(a)(2), (3) (2021 Repl. Vol., 2024 Supp.).

Sexual offense in the third degree prohibits, among other things, "engag[ing] in sexual contact with another if the victim is under the age of 14 years, and the person performing the sexual contact is at least 4 years older than the victim[.]" CR § 3-307(a)(3). It also prohibits engaging in a sexual act or "vaginal intercourse with another if the victim is 14 or 15 years old, and the person performing the act is at least 21 years old." *Id.* § 3-304(a)(4)(5).

As to the offense of sexual abuse of a minor, the statute prohibits a "parent or other person who has permanent or temporary care or custody or responsibility for the supervision of a minor [from causing] sexual abuse to the minor." CR § 3-602(b)(1).

### B. Procedural Matters

#### 1. Mr. Spicuzza's Character Witnesses

Prior to trial, Mr. Spicuzza provided the State with notice that he intended to call several character witnesses to opine on his character for honesty, peacefulness, and appropriate interactions with children. The State moved to strike Mr. Spicuzza's character witnesses. The court heard arguments on the State's motion on September 27, 2022. At the hearing, in addition to the character traits already identified, Mr. Spicuzza argued that his witnesses should be able to testify to an additional trait—his law-abiding nature. Mr. Spicuzza informed the court that he intended to submit proffers that would describe the witnesses' bases of knowledge, the relevant time frame in which they had known Mr. Spicuzza, the frequency of their contact with Mr. Spicuzza, and the quality of those contacts. The court asked for the proffers in writing, and the parties agreed to a second hearing on the character witness issue.

On October 14, 2022, Mr. Spicuzza submitted a written proffer of his character witnesses' opinions as they related to his honesty, peacefulness, appropriateness with children, and law-abiding nature. The proffer identified eight character witnesses. The court held a second hearing on December 16, 2022. At that hearing, Mr. Spicuzza asserted only two traits—honesty and peacefulness—and withdrew traits of appropriateness with children and his law-abiding nature. He argued that his honesty was relevant because he planned to testify at trial. He added that his proffer detailed the witnesses' proposed testimony and reflected that each witness was qualified to testify. The prosecutor responded that the testimony proffered was not relevant to the charges, lacked specificity,

5

and that each witness' proffer was identical and conclusory. Defense counsel responded that each witness had spent enough time with Mr. Spicuzza to form their proffered opinion. Counsel also outlined each witness's connection to Mr. Spicuzza.

After argument, the court concluded that, because there were no allegations of force as part of the charges against Mr. Spicuzza, his character for peacefulness was irrelevant. As to honesty, the court determined that the proffers were too conclusory. The bare-boned proffers, the trial court concluded, did not provide enough "details" or "information" to assess whether the witnesses' testimony "would be appropriate or not" because it included "no information as to the basis for their opinion." The court also recognized that the proffers seemed geared toward the traits of appropriateness with children and his law-abiding nature—traits that Mr. Spicuzza had abandoned. Accordingly, the court ruled that the proffers lacked an adequate basis, and thus granted the State's motion to preclude the proffered witnesses from testifying about Mr. Spicuzza's character for honesty.

### 2. The State's "Common Scheme" Evidence

During discovery, the State identified four friends of H., all minors, who were interviewed by Ms. Moneymaker in February 2022. Mr. Spicuzza filed a motion in limine seeking to exclude evidence related to the four alleged victims under Maryland Rule 5-404(b). Mr. Spicuzza argued that evidence of his alleged other bad acts with H.'s minor friends was inadmissible under the rule. Mr. Spicuzza asserted that the alleged other bad acts did not fall within one of the exceptions in Rule 5-404(b), the four witnesses would not be able to provide clear and convincing evidence of Mr. Spicuzza's involvement in other crimes, and the testimony would be unfairly prejudicial to Mr. Spicuzza. Mr.

Spicuzza also argued that, with respect to the allegations concerning H., the witnesses were not present when the alleged abuse occurred, and the witnesses therefore lacked firsthand knowledge of any alleged abuse.

The court heard arguments on Mr. Spicuzza's motion in limine at the December 2022 hearing. The prosecutor argued that evidence of Mr. Spicuzza's interactions with H.'s minor friends was admissible as evidence of a "common scheme or plan" under that exception in Rule 5-404(b). The prosecutor further asserted that the evidence reflected a "common plan" to groom the girls by offering them alcohol, marijuana, and vapes "to relax them." The prosecutor summarized the evidence as "showing porn to all" of the alleged victims, "soliciting . . . sex," and "soliciting to see breasts." The prosecutor argued that "when you see the commonality of all the individual steps [Mr. Spicuzza] took with each victim, it shows the common scheme and plan[,]" which, according to the State, would be admissible evidence in its case in chief. In support of the common scheme theory, the prosecutor "reminded" the court that the State's rape charges included the rape of H. while she was "physically helpless" because Mr. Spicuzza had provided her with vapes and alcohol. The vapes and alcohol, the State asserted, embodied the "commonality and the scheme." That is, Mr. Spicuzza would "request different solicitations after he provided the alcohol and vapes and marijuana."

The court denied Mr. Spicuzza's motion to exclude the witnesses. It reasoned that the proffered testimony fit within the common scheme or plan exception because the victims were similar in age; they all claimed that Mr. Spicuzza offered to exchange alcohol, vapes, and marijuana for sexual favors; and they asserted that Mr. Spicuzza showed them

7

pornography. Additionally, the court found the proffered evidence was clear and convincing and that its probative value was not substantially outweighed by the risk of unfair prejudice.

### C. The Trial

At the outset of the trial, Mr. Spicuzza moved to reconsider the court's exclusion of his character evidence. He also indicated that he intended to renew his objection at the start of the defense's case. The court reserved its ruling on his motion until then. Defense counsel also stated that he was "still asserting under [Rule 5-]404(b) that" A.L.'s "testimony as an alleged victim should not be allowed and we adopt all of the same arguments."

### 1. The State's Case in Chief

The State called six witnesses in its principal case. Mr. Spicuzza testified in his own defense. We provide a general overview of the evidence, and some additional detail with respect to the evidentiary issues that are before us.

#### a. H.'s testimony

H. was 15 years old at the time of trial. Mr. Spicuzza and her mother divorced when she was 7. H.'s mother remarried, and H. lived with her mother and stepfather during the week and spent every weekend with Mr. Spicuzza. H. testified that her mother and stepfather had strict rules, but that her father did not.

H. testified that her father had sexually abused her for two years. She stated that after her parents divorced, Mr. Spicuzza lived at his parents' house, and the sexual abuse started while he was living there. She testified that during the period in which Mr. Spicuzza

8

was residing with his parents, he touched H.'s vagina on approximately three or four occasions. H. also testified that, when she was 12 years old and Mr. Spicuzza had not yet moved into his own apartment, Mr. Spicuzza told her he was "going to have sex with you one day whether you like it or not."

When H. was around 12 years old, Mr. Spicuzza moved into a one-bedroom apartment, and she continued to spend every weekend with him. H. testified that Mr. Spicuzza would buy her marijuana and alcohol, which she consumed in his apartment. During this period, according to H., the abuse continued—initially consisting of Mr. Spicuzza touching her vagina, licking her vagina on "too many" instances to estimate, and ultimately escalating to vaginal intercourse. She testified that he would try to lick her vagina, and that "[t]he first bunch of times," she "refused and would not let him." However, "in the end," she "gave up because he was too pushy."

H. testified that he started to use sex toys on her when she was 12 years old, although she was "not a hundred percent sure" when it started. She did not testify as to when her father raped her for the first time. However, she testified that the last time that she had vaginal intercourse with Mr. Spicuzza was on the morning of February 22, 2022—the same day of her first interview at child protective services. H. testified that she had drunk rum and Coke and smoked marijuana. She stated that Mr. Spicuzza had bought the alcohol and that one of his friends had left the marijuana at Mr. Spicuzza's apartment. H. testified that Mr. Spicuzza had pulled out her tampon as he licked her vagina and had intercourse with her.

H. described other sexual acts. She testified that, approximately "three times," Mr. Spicuzza asked for oral sex in exchange for H. having friends over, or for providing her

9

with marijuana. H. also testified that Mr. Spicuzza would ask her to rub his penis with her hand and would not let her leave the room until she did so. H. testified that Mr. Spicuzza also bought a tan dildo, a purple sex toy, and vaginal plugs, which he used on her vagina. The State's exhibits included photographs taken of Mr. Spicuzza's apartment that showed the above-described sex toys that were photographed next to H.'s deodorant and AirPods. H. confirmed that the sex toys in the photographs were the ones used by Mr. Spicuzza on her, including "another vibrator" that he bought H. for her fourteenth birthday.

After H. described the sexual abuse, the prosecutor asked H. about spending time with her friends while staying with Mr. Spicuzza. H. testified that she often had one or more of her four friends—A.L., A.B., C., and I.H.—with her when she stayed at Mr. Spicuzza's apartment. H. testified that Mr. Spicuzza had certain rules when she had friends over: (1) the girls were not permitted to tell their parents what happened at the house; and (2) they were not permitted to take videos with their phones. H. testified that when they were at Mr. Spicuzza's apartment, H. and her friends would smoke marijuana, drink, and party.

According to H., Mr. Spicuzza would buy them marijuana, alcohol, and vape pods, and in exchange, would ask the girls to show him their "tits." H. stated that Mr. Spicuzza made this request "too many" times "to count." H. stated that Mr. Spicuzza showed pornographic videos to H. and her friends 20 to 30 times. H. warned her friends to "be careful" around her father because "he's kind of creepy[.]"

H. testified that on February 22, 2022, she learned that I.H. and A.L. had been interviewed by a social worker at child protective services, and that her mother was also taking her to child protective services to be interviewed. H. acknowledged that during the

10

February 22 interview with social worker Nichole Moneymaker, she did not disclose any sexual abuse or inappropriate behavior by Mr. Spicuzza. H. testified that she was scared her father would go to jail and that she would not be able to see him again.

H. testified that the following day, she told her mother "almost everything" about what Mr. Spicuzza had done. On February 24, 2022, H. returned to child protective services for another interview with Ms. Moneymaker. According to H., during that interview, she disclosed a great deal of the sexual abuse that she had described to the jury, but she had "left out that he had raped" her. H. testified that she failed to disclose the rape because she knew it was a more serious charge, and she did "not want" her father "to go to jail or get into trouble."

H. was interviewed at child protective services a third time on May 13, 2022. Between the second interview on February 24 and the third interview on May 13, H. underwent counseling. H. testified that she ultimately disclosed to her mother that Mr. Spicuzza had vaginal intercourse with her and used sex toys on her. After telling her mother, H. told her counselor and Ms. Moneymaker.

b. *A.L.'s Testimony*

A.L., who was 13 years old at the time of trial, testified on the second day. She testified that, between New Year's Eve in 2021 and for a period of two to three months thereafter, she spent every weekend with H. at Mr. Spicuzza's apartment. A.L. stated that she stopped spending time at Mr. Spicuzza's because she "got uncomfortable" and told her mom. She testified that Mr. Spicuzza gave the girls alcohol, marijuana, and/or vapes

11

"[e]very time [she] went there[.]" A.L. explained that the vapes would give her "a buzz where … stuff kind of gets blurry[.]"

At this point in A.L.'s direct examination, defense counsel asked to approach and made the following objection on the record:

> [Defense Counsel]: I'm just required to make the objection again. So with respect to all of her testimony that was subject to the 404(b) hearing with respect to sex, may I have a continuing objection based on all arguments in writing and verbal?

After the court noted the continuing objection, the State continued A.L.'s direct examination. A.L. testified that Mr. Spicuzza would "try to put his hands on" her if she walked by him, "smack her butt[,]" and tell her that she had "a really nice body for her age," and that she was "hot." A.L. stated that Mr. Spicuzza made comments about her body every time she was at his apartment. A.L. testified that Mr. Spicuzza asked her for sexual favors in return for the marijuana, alcohol, and vapes. On one of those occasions, Mr. Spicuzza asked A.L. if she "would let him eat [her] out" in order to get vape pods for H. According to A.L., on one occasion after Mr. Spicuzza "had asked for a sexual favor for money, H. looked at [A.L.] and said, 'Please, I really need the money.' But [A.L.] told her no."

According to A.L., Mr. Spicuzza would buy alcohol for the girls, which they consumed "pretty much every time [they] were over there." A.L. also testified that Mr. Spicuzza would show the girls pornography "every time" they were at his apartment. The videos were "different every time," but they always depicted two people having sex or

12

doing "something sexual." While showing A.L. such videos, Mr. Spicuzza would tell A.L., "This could be us."

A.L. described an incident in which H. and A.L. were "dancing around[,]" and Mr. Spicuzza tried to touch her, but H. stopped him and told him that A.L.'s body "was hers." She also described an incident in which Mr. Spicuzza exposed himself to her and another friend by removing a blanket that was over his lap, standing up, and revealing that he was unclothed.

Finally, A.L. described an incident that occurred on January 28, 2022, in which she had fallen asleep on Mr. Spicuzza's bed while charging her phone. A.L. testified that she woke up "around like 2:00, maybe 3:00 a.m.," to Mr. Spicuzza "trying to get his hands down [her] pants." His "hand was going towards [her] vagina." After she "kind of felt him like getting closer down, . . . [she] act[ed] like [she] woke up and [she] got up and . . . went into the living room." Mr. Spicuzza followed A.L. out of the bedroom "and told [her] that he knew [she] was uncomfortable and asked [her] to come back to the room with him." A.L. refused and stayed in the living room. A.L. stated that she told her mother "everything" in February. A.L. testified that after telling her mother, she was interviewed by the social worker, Ms. Moneymaker.

### c. Ms. Moneymaker's Testimony

After A.L.'s testimony concluded, the State called Nichole Moneymaker, a child protective services investigator with the St. Mary's County Department of Social Services, who had interviewed H. and her friends. Ms. Moneymaker testified that, during her second interview of H. in February 2022, H. told her that Mr. Spicuzza "touched her

13

breasts and vagina, that he licked her vagina, asked her to give him a blow job," and "asked H. and I.H. to have sex with him in exchange for drugs, alcohol."[3]  Ms. Moneymaker also recalled H. telling her during the May 2022 interview that she was "very often or most of the time . . . either high or drunk when something bad was happening."  In addition, Ms. Moneymaker confirmed that, in her third interview of H. in May 2022, H. told Ms. Moneymaker "that her father had told her before he had ever moved into the apartment in February of 2020, 'I'm going to have sex with you one day whether you like it or not[.]'"

### d.  A.B.'s Testimony

The day after A.L.'s testimony, the State called A.B., who was 14 years old at the time of trial.  A.B. testified that she saw Mr. Spicuzza on a few days in summer 2021 while visiting with H. at Mr. Spicuzza's apartment.  According to A.B., I.H. was also in the apartment "a few times" while A.B. was there. A.B. stated that Mr. Spicuzza took "advantage" of the girls by "grooming" them, and giving them "alcohol, [] weed[,] and nicotine."  A.B. described the rules that Mr. Spicuzza required when the girls were at his home, which were that they were not permitted to take any videos or "tell anyone about anything that happened there[.]"  She testified that H. had "told [her] that her dad was into younger girls and that [she] should watch out," but because H. had told her father not to "touch" A.B., "she shouldn't have to worry."

---

[3] I.H. did not testify at Mr. Spicuzza's trial.

14

When asked "what else was going on there when you were there" besides consumption of alcohol, marijuana, and nicotine, A.B. answered that Mr. Spicuzza "was making comments on us and telling us he wanted to do things to us." She elaborated that "[h]e was talking about wanting to have sex with us and things he wanted to do to our bodies." According to A.B., after she told Mr. Spicuzza that what he was saying "was wrong," he replied that the government had "brainwashed us, that this was normal and that we were crazy."

Like A.L. and H., A.B. testified that Mr. Spicuzza showed H. and her pornography. She recalled one time when

> [h]e pulled us into his room . . . , he was underneath the covers, and his computer or his laptop was on his lap. And he said, "Hey, girls, come look at this." And he pulled up a video of a girl giving oral sex to a guy. And almost instructing us that that's what we should do and telling us to swallow and that she was doing really good.

After A.B. provided the testimony described above, defense counsel asked to approach the bench and requested a "continuing objection to the 404(b) motion[,]" to which the court agreed. The prosecution then continued its direct examination. A.B. provided other testimony concerning her time spent at Mr. Spicuzza's apartment, including consuming alcohol, smoking "weed," and using "vapes." She also testified that I.H. was present, drank alcohol, and "use[d] weed and the vapes."[4]

---

[4] In addition to H., A.L., Ms. Moneymaker, and A.B., in its case in chief, the State also called Detective Corporal Bare and Jessica Barnard, a lab technician with the Sheriff's Office. Because the testimony of these witnesses is not germane to the evidentiary issues before us, we do not discuss their testimony.

15

## 2. *Mr. Spicuzza's Defense*

### a. *Mr. Spicuzza's Testimony*

Mr. Spicuzza testified in his own defense. He vehemently denied abusing H. He also denied that he engaged in any of the criminal conduct alleged by H.'s friends. We touch upon the testimony that concerns the evidentiary issues that are before us.

Mr. Spicuzza testified that prior to his arrest, he owned a small hauling company, and he was the only employee. He worked seven days per week, and his job required him to haul materials from the St. Mary's County landfill to a landfill in Virginia. He testified that his schedule required him to go to sleep around 6:00 p.m. or 7:00 p.m. and to leave his apartment at around 3:00 a.m. or 3:30 a.m. Mr. Spicuzza stated that H. stayed with him on the weekends, and that he permitted her to have friends over as long as they did not leave the apartment once he went to bed or wake him up. Because he wanted H. to feel at home in his apartment, Mr. Spicuzza testified that he let H. and her friends have "the run of the mill[.]"

Mr. Spicuzza testified that, after learning that H., A.L., and I.H. left the apartment late at night without his permission, he prohibited I.H. and A.L. from returning for overnight visits. After defense counsel asked Mr. Spicuzza whether H. complained about that decision, Mr. Spicuzza answered that H. did not protest initially but that she did so later.

Mr. Spicuzza testified that he communicated with I.H.'s, A.L.'s, and A.B.'s parents "quite a bit," including when they dropped their children off at his apartment. He also

16

testified that H.'s friends' parents knew that he would often leave for work at 3:30 a.m. because he had told them.

Mr. Spicuzza denied engaging in any sexual conduct with H. or any of her friends. He denied providing H. or her friends alcohol, marijuana, or vapes, and testified that he was unaware that they were consuming these substances because he slept with his bedroom door closed. He denied he had "rules" prohibiting the girls from taking videos or photographs in his apartment. He admitted that he watched pornographic videos in his bedroom, but not in the presence of H.'s friends.

He testified that he had never deleted any photographs or videos from H.'s phone. He added that he did not know how to use an iPhone, or how an iPhone worked, and "d[id]n't even think he could make a call with" an iPhone because he had a Samsung.

Mr. Spicuzza described the events that occurred between February 22, 2022 and his arrest two days later, including (1) H.'s mother calling him and telling him that the police wanted to question H. about something, (2) the police arriving at his apartment on February 23 with a warrant and searching his apartment, (3) borrowing his mother's phone because his phone had been seized by the police, and (4) a meeting that he had with H.'s mother at his request in a Walmart parking lot, in which he tried to obtain information. On this last point, Mr. Spicuzza testified that during the Walmart meeting, he and H.'s mother had a conversation from the driver's side of their respective car windows. Mr. Spicuzza stated that H. was in the back seat taking care of his ex-wife's eight-month-old, and that he could not see H. because the windows were tinted.

17

When asked by the prosecutor about the sex toys that were visible in the photograph exhibits that had been taken during the execution of the search warrant for his apartment, Mr. Spicuzza testified that he bought them for a former girlfriend in summer 2020. He denied that he ever saw his daughter touching them or seeing them in her possession.

Mr. Spicuzza's direct examination concluded with the following exchange with his attorney.

[Defense counsel:] Did you – sir, I think this might be my last question, okay? When you heard your daughter tell this jury all of those things that she said you did to her sexually, how did you feel? Tell the truth.

[Mr. Spicuzza:] I – it it's indescribable. I don't know if any of you have children, but I don't even think you could imagine what that feels like to sit here and listen to that. That is disgusting to hear that vile, false statement come from your daughter. I can't -- I can't describe it. Nor would I want you to feel what I feel. I wouldn't wish that upon anybody.

[Defense counsel]: I don't have any other questions.

The prosecution immediately began its cross-examination by asking Mr. Spicuzza to tell the jury why H. was lying:

[Prosecutor:] So, why is your daughter lying?

[Mr. Spicuzza:] So I believe she feels that I have destroyed her social life.

After Mr. Spicuzza answered the question, defense counsel asked to approach the bench and moved for a mistrial. Counsel stated that the question should be stricken because "it's an inappropriate, inadmissible question to ask another witness to comment on the thought process of another witness." The prosecutor responded that defense

18

counsel had opened the door with his last question. The court agreed with the prosecutor, denied defense counsel's motion for a mistrial, and overruled the objection. The prosecutor's cross-examination of Mr. Spicuzza resumed. The prosecutor asked Mr. Spicuzza questions about H.'s mother's demeanor during their conversation in the Walmart parking lot, the name of the girlfriend for whom Mr. Spicuzza allegedly purchased the sex toys, and the circumstances under which the relationship ended.

The prosecutor also asked Mr. Spicuzza several questions about the conversations that he claimed to have had with H.'s friends' parents, about which he had testified during his direct examination. The prosecutor identified each of H.'s friends' parents, and asked Mr. Spicuzza questions in which he confirmed how often he spoke to each of them. He confirmed that he told each of the parents that he left his apartment at 3:30 a.m., the parents were aware that the girls would be left alone, and that the parents confirmed to him that they did not have a problem with their daughters being left alone.

b. *Trial Court's Denial of Mr. Spicuzza's Motion to Reconsider Character Witnesses*

After Mr. Spicuzza testified, defense counsel asked that the court reconsider its prior ruling related to character witnesses. Specifically, defense counsel asked the court to permit Mr. Spicuzza's mother, older brother, and two other witnesses to testify as to Mr. Spicuzza's character for honesty. The court denied the motion for all the reasons

previously stated by the court at the pretrial motions hearing, stating that nothing had changed from that hearing.

### c. *Other Defense Witnesses*

Although the court denied Mr. Spicuzza's request that his mother and brother be permitted to testify as to his character for honesty, his mother and brother both testified about other subjects relating to their interactions with Mr. Spicuzza. Mrs. Spicuzza provided background information pertaining to their family, her husband's and her occupations, their retirement, Mr. Spicuzza living with them after his divorce, and Mr. Spicuzza's closeness with both of his parents. On cross-examination, the prosecution asked if Mrs. Spicuzza lent her phone to her son after his phone was seized as part of the search warrant on February 23, 2022. She testified that Mr. Spicuzza said he "needed to borrow it to call work." She also testified that her phone was an iPhone.[5]

### 3. *State's Rebuttal Witnesses*

The State called H.'s mother, D.R., to testify concerning her recollection of the conversation that she had with Mr. Spicuzza on February 22, 2022, in the Walmart parking lot from their respective automobiles. She testified that Mr. Spicuzza would have been able to see H. in the backseat behind the driver's side because her window was partially

---

[5] Mr. Spicuzza's brother testified that he helped his mother clean out Mr. Spicuzza's apartment, and that the brothers are both close with their parents. Defense counsel also called H.'s stepfather and asked him whether he knew H.'s friends. The stepfather testified that he did. In response to defense counsel's question whether H.'s mother and stepfather had strict rules, he confirmed that they did.

down.  D.R. described H.'s demeanor as "hysterical[,]" and testified that Mr. Spicuzza told H. that he loved her, and stated that "[h]e did not touch the other girls."

The State also called A.B.'s father and A.L.'s mother and father.  Each parent testified as to their limited interactions with Mr. Spicuzza and testified that Mr. Spicuzza never informed them that he would be leaving his apartment at 3:30 a.m. and that the girls would be alone.

### 4.  Conviction and Sentencing

The jury returned a guilty verdict on all counts.  The court sentenced Mr. Spicuzza as follows: 25 years with credit for 476 days for count 1 (sex abuse of a minor); 20 years running consecutively to count 1, ten of those suspended, for count 2 (rape in the second degree); 20 years running consecutively to counts 1 and 2, ten of those suspended, for count 3 (rape in the second degree); 20 years running consecutively to counts 1, 2, and 3, ten of those suspended, for count 4 (rape in the second degree); 20 years running consecutively to counts 1, 2, 3, and 4, ten of those suspended for count 5 (rape in the second degree); and 10 years running consecutively to counts 1, 2, 3, 4, and 5 for count 6 (sex offense in the third degree).  The court also sentenced Mr. Spicuzza to five years of supervised probation after he is released.

### 5.  Appellate Court of Maryland

Mr. Spicuzza timely appealed to the Appellate Court of Maryland.  The Appellate Court affirmed his convictions.  *Spicuzza v. State*, No. 808, 2025 WL 782335, at *1 (Md. App. Ct. Mar. 12, 2025).  The court held that the testimony of A.B. and A.L., as well as the State's witnesses mentioning I.H., was not admissible under the common scheme or

21

plan exception in Maryland Rule 5-404(b). The court noted that "similarities or patterns alone do not establish a common scheme." *Id.* at \*5. The court further observed that A.L. and A.B. were at Mr. Spicuzza's apartment at different times, and that his actions toward A.L. and A.B. were not relevant for purposes of proving Mr. Spicuzza's proclivity for illicit relations with H. *Id.* The court also noted that "H.'s allegations dated back to when Mr. Spicuzza lived with his parents, a time before A.L. and A.B. came into the picture." *Id.*

Although the Appellate Court agreed with Mr. Spicuzza that A.B.'s and A.L.'s testimony was not admissible as evidence of a common scheme, the court nonetheless concluded that the testimony was admissible because it "helped to explain H.'s delay in reporting the abuse that she suffered." *Id.* The court noted that during H.'s cross-examination, defense counsel impugned her credibility by contending that she had not disclosed all of her allegations and waited until May 13 to accuse her father of rape. *Id.* at \*6. The Appellate Court determined that the "'bad acts' were relevant to explain H.'s delay in revealing the abuse sooner." *Id.* at \*9. The Appellate Court reasoned that A.B.'s testimony corroborated H.'s testimony over her concern that she did not want her father to go to jail for his alleged acts, and "bolstered H.'s veracity in describing the lengths H. went to abate her fears." *Id.* The court also determined that "A.L.'s and A.B.'s testimony helped plug some of the gaps in H.'s memory[]" that arose because of drug and alcohol consumption, and the suppression of memories. *Id.* The court concluded that the testimony was "specially relevant, and more importantly, admissible." *Id.*

22

Turning to the potential prejudicial effect of this evidence, the Appellate Court acknowledged that the danger of unfair prejudice is always present when the State seeks to introduce evidence of a defendant's other crimes. *Id.* at *9. But it reasoned, even with this danger lurking, the "probative value of A.L.'s and A.B.'s testimony outweighed the incidental prejudice to Mr. Spicuzza." *Id.* at *10.

The Appellate Court held that the trial court did not err in refusing to permit Mr. Spicuzza's character witnesses to testify to his honest character. The Appellate Court considered the differences between "'honesty evidence' bearing on Mr. Spicuzza's charged offenses and 'honesty evidence' bearing on his credibility as a witness." *Id.* at *10. As to the first type, the Appellate Court concluded that honesty was not a relevant trait to any of the offenses for which the State had charged Mr. Spicuzza. *See id.* at *11–12. The Appellate Court concluded that, because none of Mr. Spicuzza's charges qualified as veracity impeaching offenses, the circuit court correctly granted the State's motion in limine to exclude Mr. Spicuzza's witnesses before trial. *Id.* at *14.

The Appellate Court also rejected Mr. Spicuzza's argument that the proffered testimony should have been admitted to rehabilitate Mr. Spicuzza after he testified. Although the court acknowledged that, through the prosecutor's cross-examination, the State uncovered contradictory statements between Mr. Spicuzza's testimony and the testimony of other witnesses, the court held that the prosecutor's cross-examination and introduction of testimony by the impeachment witnesses did not trigger rehabilitation through the introduction of character witnesses. *Id.* at *14–16.

23

The Appellate Court further determined that the circuit court did not abuse its discretion in determining that Mr. Spicuzza's proffers pertaining to his witnesses' opinion testimony lacked an adequate basis sufficient to permit his character witnesses to testify. *Id.* at *16–17.

Finally, with respect to Mr. Spicuzza's assertion that the trial court erred in permitting the State to ask him the "why would she lie" question, the Appellate Court agreed with the State. *Id.* at *17. Examining the record, the Appellate Court determined that Mr. Spicuzza's testimony on direct examination—that H. made a false statement— should not have been admitted. *Id.* at *19. The Appellate Court observed that the prosecutor should have objected to Mr. Spicuzza's response to his counsel's question as an "improper characterization of another witness's testimony." *Id.* That said, reasoned the court, Mr. Spicuzza generated the defect. *Id.* The Appellate Court concluded that "[t]o allow him to object during his cross-examination when the State seeks to explore the very matter he introduced would compound the mistake." *Id.* The Appellate Court further determined that H. had testified earlier that she relied and depended on Mr. Spicuzza. *Id.* at *20. In light of the testimony, the Appellate Court determined that the prosecutor had reason to believe that Mr. Spicuzza might know H.'s motive to lie, especially because Mr. Spicuzza volunteered the issue. *Id.* The Appellate Court concluded that any prejudice to Mr. Spicuzza was self-inflicted, and the trial court did not abuse its discretion in allowing the State to question Mr. Spicuzza as it did. *Id.*

# DISCUSSION

## I

### The State's Preservation Argument Pertaining
### to A.L.'s and A.B.'s Testimony

Before we examine the State's theory of special relevance of A.L.'s and A.B.'s testimony under the common scheme or plan exception, we consider the State's argument that Mr. Spicuzza failed to properly preserve his objection to the testimony, and that, therefore, the objection is waived.

As discussed above, prior to trial, Mr. Spicuzza unsuccessfully sought to exclude the other bad acts evidence involving H.'s friends. At the beginning of trial, defense counsel stated that he was "still asserting under [Rule 5-]404(b) that A.L.'s testimony should not be allowed," and adopted "all of the same arguments" that had been made at the motions in limine hearings.

Shortly into A.L.'s testimony on the first day, defense counsel renewed his objection under Rule 5-404(b) stating that "with respect to all of her testimony that was the subject to the 404(b) hearing with respect to sex, may I have a continuing objection based on all arguments in writing and verbal?" After the court noted the continuing objection, the prosecutor continued A.L.'s direct examination, during which A.L. testified that Mr. Spicuzza (1) tried to put his hands on her as she walked by him, smacked her butt, and made sexual comments about her body; (2) propositioned her for oral sex in exchange for him giving money to H. or buying vapes; (3) showed the girls pornography every time they were in his apartment, and told A.L. "it could be us"; (4) exposed himself to A.L. and

25

another friend; and (5) tried to get his hands down her pants after she had fallen asleep in his bed while trying to charge her phone, and told A.L.—after she awoke and went into another room—that "he knew she was uncomfortable and ask[ed her] to come back to the room with him."

On the following day, A.B. testified. Defense counsel did not object to her testimony at the outset. Prior to any objection by defense counsel, A.B. testified that Mr. Spicuzza: (1) took "advantage" of the girls by "grooming" them and giving them "alcohol, [] weed[,] and nicotine"; (2) "talk[ed] about wanting to have sex with [them] and things he wanted to do to [their] bodies"; (3) had rules prohibiting them from taking any videos or "tell[ing] anyone about anything that happened there"; and (4) showed them pornographic videos of a girl performing oral sex and instructing the girls on how they should perform oral sex in a similar manner.

After A.B. provided this testimony, defense counsel asked to approach the bench and requested a "continuing objection to the 404(b) motion," to which the court agreed.[6]

---

[6] The exchange at the bench was as follows:

[Defense counsel]: Your Honor, may we approach real quick?

The Court: Come on up.

[Defense counsel]: I just assume Your Honor is ready for a continuing objection to the 404(b) motion. Is that correct?

The Court: Yes.

[Prosecutor]: Yes.

The Court: I said that.

26

The prosecution then continued its examination. A.B. continued to testify about her time spent with H. at Mr. Spicuzza's apartment, including that they consumed alcohol, used "weed" and "vapes," and that I.H. was present and consumed the intoxicating substances as well.

On appeal, the Appellate Court determined that there was no waiver because the trial court considered the defense's objections to the other bad acts at the pretrial motion in limine hearing, and that Mr. Spicuzza's trial objection at the time of A.L.'s testimony in which he objected "to all of her testimony that was the subject of the 404(b) hearing with respect to sex" "called back to that pre-trial hearing and preserved his arguments for review" concerning all of the "witnesses' testimony" in their entirety. *Spicuzza*, 2025 WL 782335, at *3 n.2.

The State argues that the Appellate Court's determination with respect to preservation is inconsistent with the Maryland Rules in two respects: (1) it is at odds with the contemporaneous objection requirement embodied in Maryland Rule 4-323(a); and (2) it ignores the plain language of Rule 4-323(b), which restricts continuing objections to questions clearly within the scope of the objection. Specifically, the State points out that, under the Maryland Rules, even where a pretrial objection is made to evidence at a motion

---

[Defense counsel]: Thank you very much.

The Court: All right.

in limine hearing, a party is still required to make an objection contemporaneous with the introduction of the evidence at trial in order to preserve the subject for appellate review.

The State argues that defense counsel's objection at the beginning of A.L.'s testimony whereby counsel objected to "all of *her* testimony that was the subject of the 404(b) hearing" was not broad enough to encompass (1) other bad acts evidence relating to Mr. Spicuzza providing the girls with intoxicating substances, and (2) the testimony of a different witness—A.B.—who testified the following day. Mr. Spicuzza contends that his objections were properly preserved. He argues that defense counsel properly made an objection at the beginning of A.L.'s testimony, and the trial court and the parties understood that it extended to A.B.'s testimony.

Whether an evidentiary issue is properly preserved is an issue that arises under the Maryland Rules, interpretations of which are questions of law that we review de novo. *State v. Schlick*, 465 Md. 566, 573 (2019).

### A. Maryland Rule 4-323

Maryland Rule 4-323 sets forth requirements for preserving objections with respect to evidentiary rulings. Rule 4-323(a) states, in pertinent part, that "[a]n objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived." This is known as the "contemporaneous objection rule." *Kang v. State*, 393 Md. 97, 119 (2006).

The contemporaneous objection rule applies "to rulings on motions in limine that result in the admission of evidence[.]" *Reed v. State*, 353 Md. 628, 638 (1999). Thus, "when a motion in limine to exclude evidence is denied, the issue of the admissibility of

28

the evidence that was the subject of the motion is not preserved for appellate review unless a contemporaneous objection is made at the time the evidence is later introduced at trial." *Klauenberg v. State*, 355 Md. 528, 539 (1999); *see also Reed*, 353 Md. at 637 (quoting *Prout v. State*, 311 Md. 348, 367 (1988)) (collecting cases and explaining that "when a trial judge makes a final ruling on a motion in limine to admit evidence, the party opposing the admission of the evidence must subsequently object at trial when the evidence is offered to preserve his objection for appeal" (citation modified)). This requirement reflects the reality that "[s]trategies and positions of a party often change over the course of litigation and even within the course of a conversation during trial." *Lopez-Villa v. State*, 478 Md. 1, 12–13 (2022) (citation modified).

The rule also permits a party, or the court, on its own initiative, to "grant a continuing objection to a line of questions by an opposing party." Md. Rule 4-323(b). "For purposes of review by the trial court or on appeal, the continuing objection is effective only as to questions clearly within its scope." *Id.*

### B. Defense Counsel Sufficiently Preserved the Objection to A.L.'s Testimony and a Portion of A.B.'s Testimony for Appellate Review

Applying these rules to A.L.'s and A.B.'s testimony, defense counsel was required to make contemporaneous objections to the admission of the testimony "at the time it was offered or soon thereafter," Md. Rule 4-323(a), unless the court granted a continuing

29

objection to the line of questions and the testimony was clearly within the scope of the continuing objection, *id.* 4-323(b).

Based upon our review of the record, defense counsel preserved his objections to A.L.'s testimony for our review. Defense counsel objected to A.L.'s testimony before she testified. The basis for the objection was that it was impermissible under Rule 5-404(b), and counsel stated that it was adopting all of the same arguments that were made at the motion in limine hearing. At the beginning of A.L.'s testimony, counsel made a contemporaneous objection to "all of *her* testimony" "with respect to sex." Although it would have been better practice for defense counsel to articulate at that time that he also objected to the evidence related to intoxicating substances, we observe that some of A.L.'s testimony included allegations for which the intoxicating substances was part and parcel of the allegations "with respect to sex." For example, A.L. testified that Mr. Spicuzza propositioned her for oral sex in exchange for his buying vapes for H. and her friends. And most of A.L.'s testimony involved allegations of sexual misconduct. Moreover, as noted, at the beginning of trial and on the same day that A.L. testified, defense counsel lodged a broader objection—objecting to all of A.L.'s testimony that was impermissible under Rule 5-404(b) for the same reasons expressed at the motion in limine hearings. Based upon our review of the record, defense counsel preserved the objection to A.L.'s testimony.

We determine, however, that the objection that defense counsel made one day earlier to A.L.'s testimony was not broad enough to cover A.B.'s testimony. As noted, the objection that was made in connection with A.L.'s testimony was limited to "her" testimony. A.B.'s testimony the following day was clearly beyond the scope of the

30

contemporaneous objection made on the prior day in connection with a different witness. Indeed, defense counsel appeared to recognize that his prior objections did not encompass A.B.'s testimony when, during A.B.'s testimony, he asked to approach and asked whether the court "was ready for a continuing objection to the 404(b) motion." We therefore determine that the portion of A.B.'s testimony that preceded defense counsel's objection was waived. Despite this waiver, the testimony admitted after the objection—that Mr. Spicuzza provided them with alcohol, vapes, and marijuana, and that I.H. was present and partook in the use of those substances—was preserved.

In conclusion, we hold that the ultimate issue—whether the other bad acts evidence consisting of Mr. Spicuzza propositioning minors, showing them pornography, engaging in unlawful sexual touching of A.L., and providing the girls with intoxicating substances— was adequately preserved for appellate review. Defense counsel objected to A.L.'s testimony on these matters and the portion of A.B.'s testimony related to Mr. Spicuzza providing intoxicating substances to minors. Based upon this record, defense counsel's objection to the other bad acts evidence was preserved for review.

## II

### "Other Bad Acts" and the Legal Framework for Admissibility

Generally, evidence of "other crimes" or "other bad acts" may not be introduced to prove that a defendant is guilty of the offense for which he or she is on trial. *See State v. Faulkner*, 314 Md. 630, 633 (1989). Indeed, "there are few principles of American criminal jurisprudence more universally accepted than the rule that evidence which tends to show that

the accused committed another crime independent of that for which he is on trial, even one of the same type, is inadmissible." *State v. Taylor*, 347 Md. 363, 369 (1997) (citation modified). As we explained recently, "[e]vidence of other bad acts is admissible only if: (i) it is relevant to some contested issue in the case other than the defendant's propensity to commit crime; (ii) proven by clear and convincing evidence; and (iii) where the need for and probative value of the evidence is not outweighed by the risk of unfair prejudice." *Browne v. State*, 486 Md. 169, 185–86 (2023) (citing *Faulkner*, 314 Md. at 634–35).

### A. Maryland Rule 5-404(b)

The admissibility of other crimes or bad acts evidence, other than for impeachment purposes, is governed by longstanding evidentiary principles that are currently set forth in Maryland Rule 5-404(b), which states:

> Evidence of other crimes, wrongs, or other acts . . . is not admissible to prove the character of a person in order to show action in the conformity therewith. Such evidence, however, may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, absence of mistake or accident, or in conformity with Rule 5-413.[7]

*See also Merzbacher v. State*, 346 Md. 391, 406 (1997) ("Maryland Rule 5-404(b) embodies the common law rule of 'other crimes evidence.'").

---

[7] Maryland Rule 5-413 provides that "[i]n prosecutions of sexually assaultive behavior as defined in Code, Courts Article, § 10-923(a), evidence of other sexually assaultive behavior by the defendant occurring before or after the offense for which the defendant is on trial may be admitted in accordance with § 10-923." The State did not seek to admit the testimony of A.B. and A.L. through CJ § 10-923, therefore, Rule 5-413 is inapplicable in this case.

We apply an exclusionary approach when analyzing evidence of other bad acts under Rule 5-404(b). *Browne*, 486 Md. at 188–90; *Harris v. State*, 324 Md. 490, 494–95 (1991). The Rule's first sentence "provides that other bad acts evidence is inadmissible when it is offered to suggest that because the defendant is a person of criminal character, it is more probable that the defendant committed the crime for which the defendant is on trial." *Browne*, 486 Md. at 187 (citation modified). "The second sentence clarifies that, notwithstanding the inadmissibility of other bad acts evidence to prove propensity, such events 'may be admissible for other purposes,' including, but not limited to, the enumerated purposes." *Id.* (quoting Md. Rule 5-404(b)).

"The rationale behind the exclusion of other bad acts evidence when it is offered to show propensity is not that such evidence is irrelevant or has no probative force. To the contrary, such evidence has admitted probative value." *Browne*, 486 Md. at 187 (citation modified). Instead, the Rule is "grounded in the reality that 'substantive and procedural protections are necessary to guard against the potential misuse of other crimes or bad acts evidence and avoid the risk that the evidence will be used improperly by the jury against the defendant.'" *Burris v. State*, 435 Md. 370, 385 (2013) (quoting *Streater v. State*, 352 Md. 800, 807 (1999)). "Such evidence is thus 'excluded because it may tend to confuse the jurors, predispose them to a belief in the defendant's guilt, or prejudice their minds against the defendant.'" *Browne*, 486 Md. at 187 (quoting *Terry v. State*, 332 Md. 329, 334 (1993)). As we explained in *Browne*, "the overarching concern is that the jury may use evidence of crimes that are not the subject of the trial to conclude that the defendant is a bad person and, therefore, should be convicted of the charges for which the defendant is

33

on trial for that reason, rather than based on evidence specific to those charges." *Id.* at 187–88 (citation modified); *see also Michelson v. United States*, 335 U.S. 469, 476 (1948) ("[Other bad acts evidence] is said to weigh too much with the jury and to so overpersuade them to prejudge one with a bad general record and deny [the defendant] a fair opportunity to defend against a particular charge."); *Straughn v. State*, 297 Md. 329, 333 (1983) (stating that evidence of other bad acts is excluded because "if a jury considers a defendant's prior criminal activity, it may decide to convict and punish [the defendant] for having a criminal disposition" and because "a jury might infer that because the defendant has committed crimes in the past, [the defendant] is more likely to have committed the crime" at issue).

In *Harris*, we determined that "the exclusionary approach offers the best balance between appropriate concerns for potential unfair prejudice from the introduction of other bad acts evidence, on the one hand, and the risk of excluding evidence possessing special relevance that outweighs the potential for unfair prejudice, on the other." *Browne*, 486 Md. at 188 (citing *Harris*, 324 Md. at 499–500). We explained:

> By stating the rule in exclusionary form—evidence of other bad acts is generally not admissible—followed by an exception for those instances in which the evidence 1) has special relevance, i.e., is substantially relevant to some contested issue in the case and is not offered simply to prove criminal character, and 2) has probative force that substantially outweighs its potential for unfair prejudice, the focus is correct, and the burden is where it belongs.

*Harris*, 324 Md. at 500. Given the high degree of potential unfair prejudice that accompanies the improper admission of other bad acts evidence, as well as the likelihood that the relevance of the evidence is often limited to that of the defendant's character (i.e., that he or she is a bad person), we stated that "it will be the exceptional, and not the usual,

case where the evidence of other bad acts is substantially relevant for reasons other than proof of criminal character." *Id.* We further observed that "[t]he exclusionary form of the rule clearly serves to remind the bench and bar that, unlike most other evidence, this evidence carries with it heavy baggage that must be closely scrutinized before admissibility is warranted." *Id.* We explained that by "employing the exclusionary approach, it is immediately clear that the party offering the evidence has a hurdle to overcome and must shoulder the burden of demonstrating relevance other than criminal character, as well as the burden of demonstrating that the probative value substantially outweighs the potential for unfair prejudice." *Id.* at 500–01.

Finally, we clarified in *Harris* that the "admissibility of evidence of other bad acts is not confined to a finite list of exceptions[.]" *Id.* at 497. "The 'so-called exceptions' identified in the Rule are thus merely examples, honed over the course of centuries of development of this common law evidentiary principle, 'of those areas where evidence has most often been found admissible even though it discloses other bad conduct.'" *Browne*, 486 Md. at 189 (quoting *Harris*, 324 Md. at 497–98); *see also McKinney v. State*, 82 Md. App. 111, 122 (1990) (describing the "exceptions" to the Rule as "a well established list of matters other than propensity that other crimes evidence may logically tend to prove").

In *State v. Faulkner*, we laid out a three-part test for evidence to be excepted from the general exclusionary approach. 314 Md. 630 (1989). To be admissible, "(1) the evidence must be specially relevant; (2) the defendant's involvement must be proved by clear and convincing evidence; and (3) the necessity for and probative value of the evidence

must not be substantially outweighed by the risk of unfair prejudice." *Browne*, 486 Md. at 190; *Faulkner*, 314 Md. at 634–35.

### 1. *Special Relevance*

"The first *Faulkner* requirement is that the evidence must be 'substantially relevant to some contested issue in the case' and 'not offered to prove the defendant's guilt based on propensity to commit crime.'" *Browne*, 486 Md. at 190 (quoting *Faulkner*, 314 Md. at 634). "When other bad acts evidence has substantial relevance to a contested issue other than propensity, it is said to have 'special relevance.'" *Id.* (quoting *Harris*, 324 Md. at 500). Stated another way, as Professor Lynn McLain explains, "to have special relevance, other bad acts evidence 'must be strongly probative of an issue other than character that is a significant issue in the case.'" *Id.* (quoting 5 Lynn McLain, *Maryland Evidence: State and Federal*, § 405:5 at 760 (3d ed. 2013) ("McLain, *Maryland Evidence*")).

As noted, Rule 5-404(b) provides a non-exhaustive list of examples of what may constitute special relevance—proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, and absence of mistake or accident. "Special relevance requires more than being 'technically or minimally relevant'; in addition to pertaining to an issue other than propensity, the issue must be genuinely contested and the evidence must be substantially relevant to it." *Browne*, 486 Md. at 192 (quoting *Emory v. State*, 101 Md. App. 585, 602 (1994)). Accordingly, prior to admitting the evidence, the trial court must determine that the issue the evidence is addressing is, in fact, genuinely contested and has more than a minimal bearing on the issue. *Id.*

36

### 2. *Clear and Convincing Evidence*

"If [the] trial court determines that the other bad acts evidence is specially relevant, the second requirement to admit the evidence under Rule 5-404(b) is that the accused's involvement in the other bad act(s) must be established by clear and convincing evidence." *Id.* at 193 (citing *Faulkner*, 314 Md. at 634).

### 3. *Weighing the Probative Value Against Possible Prejudice*

If the court determines that the proponent of the evidence has satisfied the first two requirements, it "must still weigh the necessity for and probative value of the evidence against the danger of unfair prejudice that would result from its admission." *Id.* (citing *Faulkner*, 314 Md. at 635). "If that danger substantially outweighs the necessity for and probative value of the evidence, the trial court should exclude it." *Id.* (citing Md. Rule 5-403; *Gutierrez v. State*, 423 Md. 476, 490 (2011)). "Underlying this prong of the test is the concern that other crimes or bad acts evidence 'is generally more prejudicial than probative.'" *Streater*, 352 Md. at 810 (quoting *Taylor*, 347 Md. at 369).

Finally, as we emphasized in *Streater*, if the trial court admits the bad-acts evidence, "it should state its reasons for doing so in the record so as to enable a reviewing court to assess whether Md. Rule 5-404(b), as interpreted through the case law, has been applied correctly." *Id.* at 810.

### B. *Standard of Review*

We apply a different standard of review to each step of a trial court's determination concerning each of the three *Faulkner* requirements. *Browne*, 486 Md. at 193. A trial court's determination of special relevance—whether evidence is substantially relevant to a

37

contested issue other than propensity—is a legal determination that we review de novo. *Id.* at 194 (citing *Faulkner*, 314 Md. at 634). "We review the trial judge's finding of clear and convincing evidence of the accused's involvement in other bad acts for sufficiency of the evidence." *Id.* (citing *Faulkner*, 314 Md. at 635). "Finally, we review the trial judge's balancing of probative value against the danger of unfair prejudice for an abuse of discretion." *Id.* (citing *Faulkner*, 314 Md. at 635, 641).

## III

### Admissibility of Other Bad Acts Evidence as a "Common Scheme or Plan"

Turning to the common scheme or plan exception that was the basis for the admission of the evidence at issue in this case, applying the *Faulkner* framework, we start by determining whether evidence of Mr. Spicuzza's sexual abuse of H.'s friends, and his providing them with intoxicating substances, was specially relevant to a contested issue, and not simply introduced to establish Mr. Spicuzza's propensity to commit the crimes for which he was tried: rape and sexual abuse of his daughter. The State argued to the trial court that such evidence was relevant to establish a "common scheme or plan," and the trial court admitted the evidence pursuant to that exception.

The State's theory of relevance is that Mr. Spicuzza used his daughter to lure other underage girls to his home, where he provided them with intoxicating substances, and showed them sexual materials. The State contends that by facilitating H.'s intoxication with her friends, Mr. Spicuzza subdued H., which enabled him to sexually abuse her. In addition, asserts the State, once the other girls were intoxicated in the privacy of his home, Mr. Spicuzza sexually propositioned them and showed them pornography. The State

38

asserts that Mr. Spicuzza's scheme or plan was to create an atmosphere in which H. and her underage friends would consume intoxicating substances in his home to facilitate his sexual abuse of them all. The State contends that this evidence, taken collectively, was evidence of a common scheme or plan, and was admissible as an exception to Rule 5-404(b)'s prohibition against propensity evidence.

Mr. Spicuzza disagrees. He claims that the other bad acts described by A.L. and A.B. were not part of a plan to abuse H. and, therefore, do not fall within the common scheme or plan exception. He asserts that under our case law, and the case law of the Appellate Court, similar sex offense allegations having no relationship to one another besides a method of operation or repetitive pattern are not sufficient to establish a common scheme or plan.

In arguing their respective positions, the State and Mr. Spicuzza each rely upon cases from this Court and the Appellate Court discussing Maryland's common scheme or plan jurisprudence. We start our discussion by examining the cases.

### A. Maryland Case Law Discussing and Applying the Common Scheme or Plan Exception

At the outset, we make two observations about our cases. First, cases analyzing the common scheme or plan exception arise in two procedural contexts: (1) whether the exception authorizes the admission of other bad acts evidence in a criminal trial in which the defendant is not on trial for offenses related to the other bad acts, *see, e.g.*, *Cross v. State*, 282 Md. 468 (1978); *Behrel v. State*, 151 Md. App. 64 (2003); and (2) whether a defendant's offenses were improperly joined for trial, *see, e.g.*, *Tichnell v. State*, 287 Md. 695 (1980); *Hart v. State*, 260 Md. App. 491 (2024).

39

In the joinder context, the governing inquiry is mutual admissibility—that is, whether evidence of each offense would be admissible in a separate trial of the other. *Hart*, 260 Md. App. at 527. When examining mutual admissibility, the trial court conducts the same analysis that it would conduct in determining whether evidence of other bad acts would be admissible under Rule 5-404(b). *Tichnell*, 287 Md. at 709–13, 715; *Hart*, 260 Md. App. at 527–30. In other words, if the other crimes or bad acts evidence had special relevance and was admissible pursuant to a common scheme exception in a trial for one offense, it is not error to consolidate the two offenses in a single trial. Because both procedural contexts ultimately require application of Rule 5-404(b), it is instructive to examine cases arising in each.

Second, Maryland courts have recognized two distinct ways in which other crimes evidence may fall within the common scheme or plan exception to Rule 5-404(b). *Hart*, 260 Md. App. at 528. The evidence may demonstrate either "a modus operandi, which is but one means of establishing identity[,]" or "a plan to commit one offense as part of a grand scheme to commit others." *Id.* (quoting *McKinney*, 82 Md. App. at 124). In this case, identity is not at issue. Accordingly, we are concerned only with the latter category— evidence reflecting a broader plan or scheme encompassing multiple offenses.

In *Cross v. State*, 282 Md. 468 (1978), this Court articulated the requirements for admitting other crimes or bad acts evidence under the common scheme or plan exception. There, we held that the trial court erred in admitting evidence linking the defendant to another break-in committed on the same day as the charged burglary, where the only

40

connection was that a blue car had been seen at both locations. *Id.* at 476. We described

our common scheme or plan jurisprudence as follows:

> As a general rule, in order to gain the admission of evidence of other criminal acts under the common scheme or plan exception it is necessary that the crimes, including the crime charged, so relate to each other that proof of one tends to establish the other. *Westcoat v. State*, 231 Md. 354, 368 (1963); *Wilson v. State*, 181 Md. 1, 3 (1942); see *Young v. State*, 152 Md. 89, 91–92 (1927). Moreover, there must be "not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." 2 J. Wigmore, Evidence s 304, at 202 (3d ed. 1940) (emphasis in original). The concurrence of common features under this exception, however, must be more than simply a manner of operation, which is possessed to some extent by most criminal recidivists. A method of operation is not, by itself, a common scheme, but merely a repetitive pattern. *People v. Fiore*, 312 N.E.2d 174, 178 (N.Y. 1974). Thus, evidence of other crimes can be introduced under the common scheme exception only when the relationship between the time, place, circumstances or parties involved in the crimes is such that the uncharged crime or crimes "support the inference that there exists a single inseparable plan encompassing both the charged and uncharged crimes, typically, but not exclusively, embracing uncharged crimes committed in order to effect the primary crime for which the accused has been indicted." 312 N.E.2d at 177.

*Id.* at 475–76 (citation modified).

In *State v. Jones*, 284 Md. 232 (1979), we applied and reaffirmed these principles.

There, we held that the trial court erred in admitting evidence that defendants charged with

robbing a liquor store had committed two additional robberies within a short time frame.

*Id.* at 243. We reiterated that "[i]n order to gain admission under this exception[,] it is

necessary that the crimes 'so relate to each other that proof of one tends to establish the

other.'" *Id.* (quoting *Cross*, 282 Md. at 475). In other words, we explained, "there must

be a causal relation or logical or natural connection among the various acts or they must

form part of a continuing transaction to fall within the exception." *Id.* at 244. Turning to

41

the evidence, we stated that the fact that the defendant may have robbed one of the three businesses did not establish or even tend to prove anything about the robberies at the other locations. *Id.* Nor was there any evidence that the defendant planned the three robberies in advance. To the contrary, the record showed that each site was selected at random, and the decision to rob another location was made after the prior robbery. *Id.*

The above cases are examples where we determined that the evidence was not admissible under the common scheme or plan exception. In other cases, we have determined other bad acts evidence was admissible under the common scheme or plan exception. In some of those cases, we have determined that the evidence was admissible to prove *another* exception such as motive, identity, and intent, if they are in dispute. *See, e.g.*, *Ridgeway v. State*, 140 Md. App. 49, 65–69 (2001), *aff'd on other grounds*, 369 Md. 165 (2002) (holding that evidence of a defendant's firing of a gun into an apartment where he believed people he sought revenge against were located, was properly admitted to prove motive and as part of a common scheme or plan in his trial for subsequently shooting inhabitants of a trailer, whom he believed to be the same people); *Epps v. State*, 52 Md. App. 308 (1982) (holding that the trial court had not abused its discretion in denying the defendant's severance motion that requested two counts of arson be severed from the three counts of first-degree murder, as they were evidence of defendant having set his girlfriend's first residence on fire and established his motive and a common scheme to kill his girlfriend when he set her second residence on fire, which resulted in her death).

In *Bell v. State*, 234 Md. 254 (1964), this Court found no fault in the admission of evidence of the defendant's sexual abuse of one young girl in a trial for his sexual abuse of

42

the girl's older sister. The defendant was convicted of statutory rape in a jury trial. The defendant was charged in two indictments, one charging statutory rape upon a girl under fourteen years of age, and the other charging statutory rape upon her sister, "a somewhat younger girl." *Id.* at 256. Both girls were his adopted stepchildren. After the State's motion to consolidate was denied, the State elected to proceed with the trial related to the statutory rape of the younger girl. "The defense virtually conceded that the sexual acts with the younger girl took place[,]" and the "whole defense" rested "upon [a] plea of insanity." *Id.* at 259.

At trial, over the defendant's objection, the court admitted defendant's confession, in which he confessed not only to the offenses for which he was being tried, but also confessed to the crimes against his other stepchild on "various other dates." *Id.* at 257. On appeal, the defendant argued that the trial court erred in admitting his confession into evidence "because it included the confession of offenses other than the one for which he was tried." *Id.* at 256. This Court rejected the defendant's argument and affirmed his conviction. *Id.* at 259.

We started by noting the general rule that "evidence of other crimes is not admissible," and the exceptions to that rule "where the other crime is part of a common scheme or plan, or so linked in point of time or circumstances as to show intent or motive." *Id.* at 257–58. We then turned to the legal framework applicable to admissibility of confessions. *Id.* at 258 We noted the general rule that the whole of a confession must be admitted, and that neither side can select the incriminatory or exculpatory portions. *Id.* We explained, however, that "where the relevant parts dealing with the crime charged can

43

be readily separated from those parts confessing to other crimes, some courts have required that this be done, although where separation is impracticable[,] the courts have almost uniformly held that a cautionary instruction to the jury will suffice." *Id.* We stated that the determination of what is "reasonably separable" is "usually left to the sound discretion of the trial court." *Id.*

Turning to the confession in question, we held that the trial court did not abuse its discretion in admitting the confession with an appropriate instruction to the jury to disregard the parts relating to the other girl. *Id.* "In the first place," we observed that the defendant's objection was too broad in that there was no effort on defense counsel's part to limit or delete portions of the confession. "In the second place," we noted that the "confession described sexual relations over a considerable period of time between the accused and each of the girls, both of whom were frequently present when sexual activities took place, and it would appear that the older girl took an active part in the seduction of the younger." *Id.* at 258–59. We determined that "[i]t would have been difficult to separate the statements as to each and render them intelligible." *Id.* at 259. We also observed that according to the confession, both girls were present when the incident that was the subject of the indictment took place. Finally, we determined that "[i]n any event," "there was no prejudice shown" because the defendant "virtually conceded that the sexual acts with the younger girl took place[,]" and the "whole defense rested upon the plea of insanity." *Id.*

There are several reported cases decided by the Appellate Court involving sex crimes in which other bad acts involving sex offenses were held to be inadmissible, or in

44

the joinder context, erroneously consolidated for trial, when the State's theory of admissibility or joinder was a common scheme or plan.

In *McKinney v. State*, the Appellate Court considered whether the trial court erred in consolidating three cases for trial, which resulted in the defendant's conviction of third-degree sexual assault of the three victims. 82 Md. App. 111 (1990). There the defendant was a counselor at an outdoor education program. The victims, all female campers, alleged that the defendant had touched their breasts, buttocks, and vaginal areas, but the defendant "consistently denied" any misconduct. *Id.* at 115. On appeal, the Appellate Court held that the trial court erred in consolidating the cases for trial and reversed the judgment.

The court considered the "other crimes rule" and concluded that "the evidence as to each individual offense would not be mutually admissible at separate trials." *Id.* at 119. The court reasoned that the evidence did "not tend to establish" any of the exceptions to the other crimes doctrine. *Id.* at 123. Significantly, the court determined that the "evidence of sexual contact" with each alleged victim did not fit within the common scheme or plan exception to the other crimes rule. *Id.* The court noted that the common scheme or plan exception could mean one of two things: "(1) a modus operandi, which is but one means of establishing identity"—which was not applicable in the case at hand—"or (2) a plan to commit one offense as part of grand scheme to commit others, such as a theft of nitroglycerine for use in blowing up a safe." *Id.* at 124. Under the common scheme or plan context involving the latter scenario, the court held that in a separate prosecution of a defendant for sexual contact with one child, evidence of similar conduct with a different child "would not be relevant because it would not tend to prove that kind of common scheme." *Id.*

45

In *Reidnauer v. State*, the defendant was convicted at a consolidated bench trial of unrelated sexual offenses involving two prostitutes. 133 Md. App. 311 (2000). On appeal, the Appellate Court considered whether the credibility of the two victims, and the issue of consent, "may be established by the corroborative effect of the testimony of the other." *Id.* at 314. Both victims testified at trial, recounting the defendant assaulting them and their lack of consent. *Id.* at 315. The Appellate Court reversed the convictions and remanded for new trials, concluding that the trial judge erred in joining the two cases involving separate victims of rape, sexual assault, and related offenses. *Id.* The court stated that "[e]ven though the evidence indicates that the sexual assaults committed in this case were perpetrated in a similar manner, the similarities do not establish that the offenses were part of a common scheme." *Id.* at 321.

In *Behrel v. State*, the Appellate Court considered whether the trial court erred in admitting the testimony of a second victim of sexual abuse, "Miller," during the trial in which the defendant, a former Episcopal pastor, was accused of sexually abusing a victim, "Curtis." 151 Md. App. 64 (2003). The victims were high school boarding students at a school where the defendant served as a chaplain. After the defendant was convicted in the Curtis trial, he alleged on appeal that the court erred in admitting Miller's testimony because it constituted inadmissible "other crime" evidence under Maryland Rule 5-404(b). He maintained that there was no special relevance in Miller's testimony as to what the defendant "did to [Miller] to prove any element of the Curtis child abuse offense." *Id.* at 123. The State countered that the evidence of the defendant's sexual abuse of Miller had "special relevance with regard to preparation, and to establish a common scheme or plan." *Id.*

46

The Appellate Court held that the trial court erred in admitting Miller's testimony and vacated the conviction and remanded the case for further proceedings. *Id.* at 132. The court determined that the case "fit[] within the principles set forth in *McKinney* and *Reidnauer*." *Id.* at 130. The court acknowledged the similarities in the victims' circumstances, including that they were new to the school, vulnerable because of difficulties at home, and, as the State's theory set forth, that the defendant had endeavored to gain their trust by encouraging them to participate in church-related activities at school, where they would come into close contact with him. *Id.* at 131–32. Despite these similarities, the Appellate Court concluded, "this did not mean that Miller's testimony fit within the common scheme or plan exception to the rule barring 'other crimes' evidence." *Id.* at 131.

Based upon our review of cases from this Court and the Appellate Court concerning common scheme or plan, we draw some general observations.

*First*, to be admissible under the common scheme or plan exception, it is not enough that the fact patterns underlying the different bad acts are similar. *Cross*, 282 Md. at 475. As reflected by our discussion above, in the context of other bad acts involving sex crimes, the Appellate Court has held that the common scheme or plan exception does not apply where the only link between the charged conduct and other bad acts was that they involved similar allegations but were otherwise not connected. *See Behrel*, 151 Md. App. at 131–32; *Reidnauer*, 133 Md. App. at 321; *McKinney*, 82 Md. App. at 124. Similarity between other bad acts is expected for acts undertaken by repeat offenders. *Cross*, 282 Md. at 475. When similarity is the only tie between the charged offense and different conduct, evidence

47

about the uncharged prior bad acts is merely propensity evidence and cannot be admitted under the common scheme or plan exception.

*Second*, although the most typical fact pattern for application of the common scheme or plan exception occurs where the uncharged bad acts are "committed in order to effect the primary crime for which the accused has been indicted," *Cross*, 282 Md. at 476 (citation modified), our case law has never limited the common scheme or plan exception to circumstances in which the prior bad acts at issue were necessary to achieve the charged offense. In his brief, Mr. Spicuzza points to the "classic hypothetical" of "theft of nitroglycerine for use in blowing up a safe"—an example that the Appellate Court relied upon in *McKinney*, 82 Md. App. at 124. That fact pattern, although typical, is not necessary in order for other bad acts to be admissible as evidence of a common scheme or plan. *See Cross*, 282 Md. at 475–76 (explaining that to fall within the common scheme or plan exception, "the relationship between the time, place, circumstances or parties involved is such that the uncharged crime or crimes support the inference that there exists a single inseparable plan encompassing both the charged and uncharged crimes, *typically, but not exclusively*, embracing uncharged crimes committed in order to effect the primary crime for which the accused has been indicted[]" (emphasis added)).

*Third*, we have affirmed a defendant's conviction where the trial court admitted evidence of sexual abuse of a girl in the defendant's trial for sexual abuse of the girl's older sister, in circumstances in which the two victims were often together when the sexual abuse took place "and it would appear that the older girl took an active part in the seduction of the younger." *Bell*, 234 Md. at 259. In other words, our case law supports the admission

48

of other bad acts evidence where a nexus exists between the bad acts—beyond similarities—with one of the victims playing a role in facilitating the abuse of another.

### B. The Other Bad Acts Evidence Related to H.'s Minor Friends Was Admissible Under the Common Scheme or Plan Exception

Applying the common scheme or plan exception as set forth in our case law, we hold that the other crimes or other bad acts evidence of Mr. Spicuzza's alleged sexual abuse and misconduct with H.'s friends falls within the common scheme or plan exception. The acts of abuse and misconduct described by H., A.L., and A.B. are not simply unrelated acts of abuse that are similar in nature. Rather, they are individual manifestations of a general plan in which Mr. Spicuzza used his daughter to lure her young friends into his apartment where he would ply them with vapes, alcohol, and marijuana, and watch pornography with them every time they came to his apartment, so that he could sexually abuse H. and engage in sexual criminal misconduct with her friends. Although the abuse against H. started prior to Mr. Spicuzza obtaining his apartment, it escalated in frequency and intensity— ultimately culminating in vaginal intercourse—over time as he established an atmosphere and culture conducive to sexual abuse of H. and committed other bad acts involving sexual misconduct with her friends.

A factfinder could determine that Mr. Spicuzza conceived of a general plan to groom[8] H. and her minor friends by giving them intoxicating substances and exposing them

---

[8] In *Walker v. State*, we stated that "[g]rooming refers to deliberate actions taken by a defendant to expose a child to sexual material; the ultimate goal of grooming is the formulation of an emotional connection with the child and a reduction of the child's inhibitions in order to prepare the child for sexual activity." 432 Md. 587, 602 n.10 (2013) (quoting *United States v. Engle*, 676 F.3d 405, 412 (4th Cir. 2012) (citations omitted)).

to pornography every time H. and her friends were present in his apartment, to reduce their inhibitions in order to prepare them for his sexual advances. Once Mr. Spicuzza moved into his apartment, he created a space in which—through his special rules, intoxicating substances, and constant exposure of the girls to sexual materials and abuse—he was able to develop a general plan to escalate the abuse of his daughter and to abuse or attempt to abuse her friends.

Mr. Spicuzza's general plan included quid pro quo proposals for sexual favors to H. and her friends. For example, H. testified that on several occasions, Mr. Spicuzza asked her for oral sex in exchange for having her friends over or providing her with marijuana. On another occasion, A.L. testified that Mr. Spicuzza asked her for a sexual favor in exchange for money while in H.'s presence, and H. looked at A.L. and said, "Please, I really need the money." A.L. told her no. In other words, Mr. Spicuzza leveraged H.'s relationship with her friends to receive sexual favors from H. He similarly attempted to leverage A.L.'s relationship with H. to sexually abuse A.L.

H. was the central figure in his general plan. A factfinder could determine that, through his manipulation and plying his daughter and her friends with intoxicating substances, while providing a place where H. and her friends had the "run of the mill," Mr. Spicuzza used H. to lure her friends to his apartment so that he could sexually abuse or attempt to sexually abuse all of them. Without H., Mr. Spicuzza would not have had access to these young girls so that he could groom and abuse or attempt to abuse them in the privacy of his apartment.

A factfinder could reasonably conclude that these other bad acts are "individual manifestations" of Mr. Spicuzza's general plan to abuse H. and any other underage girls H. would bring to Mr. Spicuzza's apartment. *See Cross*, 282 Md. at 475. Every time H. and her friends were at his apartment, he employed his grooming tactics on H. and all of her friends—creating an atmosphere in which he showed them sexual materials and plied them with intoxicating substances to diminish their capacity to both physically and emotionally resist his advances. H. testified about one instance when Mr. Spicuzza assaulted her when "[she] was very out of it" after using alcohol and marijuana. Ms. Moneymaker testified that H. told her that "very often or most of the time" she was "either high or drunk when something bad was happening." In A.L.'s case, Mr. Spicuzza provided her with vapes, which she used "[e]very time" she was at his house. A.L. testified that the vapes made her feel "blurry." And on one occasion, while A.L. slept at his apartment, Mr. Spicuzza attempted to put his hand on her vagina.

To be sure, Mr. Spicuzza initially sexually abused his daughter before he moved into his apartment and had an opportunity to ply her with alcohol, drugs, and vapes. At that point, he may or may not have had a plan to abuse other girls in his apartment. That is irrelevant to the application of our common scheme or plan exception. None of our precedent suggests that a common scheme or plan needs to have been conceived at the outset of a defendant's criminal conduct for evidence of other subsequent bad acts in furtherance of such a scheme to be admissible.

The testimony of A.L. and A.B. was not just propensity evidence.[9] It is evidence that, whatever his motivations were at the beginning, Mr. Spicuzza eventually developed a common scheme or plan to abuse not only H., but also other young girls brought within his orbit by his daughter. He encouraged her to bring her friends within his reach with the promise of illicit substances. He groomed them, attempted to normalize sexualized behavior with them, and imposed rules of secrecy to hide his activities. Far from mere similarities among otherwise unrelated incidents, a reasonable factfinder could determine that this was all part of a common scheme or plan in which he further exploited his daughter into playing the central, tragic character supplying him with access to all his victims and unwittingly helping to normalize the behavior he engaged in around them. In short, the other bad acts evidence supported a common scheme or plan and was therefore admissible.[10]

---

[9] We say not "just" propensity evidence because it clearly is propensity evidence. A.B. and A.L. testified to conduct by Mr. Spicuzza that was very bad and very similar to some of the conduct he engaged in with his daughter. But the test of whether other bad acts evidence is admissible is whether it has "special relevance" beyond propensity. *Browne v. State*, 486 Md. 169, 190 (2023).

[10] Before the Appellate Court, the State argued that, in addition to being admissible under the common scheme or plan exception, A.L.'s and A.B.'s testimony was also admissible under an alternative theory of admissibility—to explain H.'s delay in reporting the abuse that she suffered. After rejecting the State's common scheme or plan theory, the Appellate Court found this "contention more persuasive." *Spicuzza v. State*, No. 808, 2025 WL 782335, at *9 (Md. App. Ct. Mar. 12, 2025). The Appellate Court examined the State's new theory of delayed disclosure—raised for the first time on appeal—by assessing the evidence and applying the *Faulkner* factors to determine whether the evidence could have been admitted under a new theory. *Id.* After applying the factors, the Appellate Court agreed with the State and affirmed the circuit court's judgment on that basis. *Id.* at *10.

52

## "Why-Is-She-Lying" Question and the
## "Opening the Door" Doctrine

### A. Propriety of the Question

Next Mr. Spicuzza contends that the trial court erred in failing to grant a mistrial after the prosecutor asked him on cross-examination to tell the jury why his daughter would be lying about the abuse. The State responds by arguing that, even if the question was improper, Mr. Spicuzza opened the door to this question. Alternatively, the State argues that any error was harmless. The propriety of the State's "why-is-she-lying" question, and its admissibility under the "opening the door" doctrine, are questions of law that we review de novo. *State v. Heath*, 464 Md. 445, 457 (2019).

As noted above, Mr. Spicuzza's direct examination concluded with the following exchange with his attorney:

> [Defense counsel:] Did you – sir, I think this might be my last question, okay? When you heard your daughter tell this jury all of those things that she said you did to her sexually, how did you feel? Tell the truth.

---

Before this Court, Mr. Spicuzza argues that the Appellate Court erred by (1) considering the State's other bad acts evidence under a new theory that was not presented to the trial court, (2) determining in the first instance whether the evidence had "special relevance" under an alternative theory of admissibility, and (3) undertaking its own Rule 5-403 balancing analysis—which requires a trial court, prior to the admission of evidence, to determine whether its probative value is substantially outweighed by the danger of unfair prejudice. Mr. Spicuzza argues that the trial court's highly discretionary determination of whether to admit the evidence turns on the issue for which it is being presented, and that the probative value of the evidence is dependent upon the theory. Given our holding that the other bad acts evidence was admissible under the common scheme or plan exception, we do not need to address Mr. Spicuzza's argument that the Appellate Court erred in affirming the judgment on an alternative basis.

[Mr. Spicuzza:]        I – it it's indescribable.  I don't know if any of you have children, but I don't even think you could imagine what that feels like to sit here and listen to that.  That is disgusting to hear that vile, false statement come from your daughter.  I can't -- I can't describe it.  Nor would I want you to feel what I feel.  I wouldn't wish that upon anybody.

[Defense counsel]:   I don't have any other questions.

The prosecution immediately began its cross-examination by asking Mr. Spicuzza to tell the jury why H. was lying:

[Prosecutor:]        So, why is your daughter lying?

[Mr. Spicuzza:]       So I believe she feels that I have destroyed her social life.

After Mr. Spicuzza answered the question, defense counsel asked to approach the bench and moved for a mistrial.  Counsel stated that the question should be stricken because "it's an inappropriate, inadmissible question to ask another witness to comment on the thought process of another witness."  The prosecutor responded that defense counsel had opened the door with his last question.  The court agreed with the prosecutor, denied defense counsel's motion for a mistrial, and overruled the objection.

For the following reasons, we hold that the State's question to Mr. Spicuzza to speculate or opine on why his daughter was lying was impermissible as a matter of law. We further hold that the "opening the door" doctrine has no application because the "why-is-she-lying" question was inadmissible for reasons beyond relevance.

"In a criminal case tried before a jury, a fundamental principle is that the credibility of a witness and the weight to be accorded [to] the witness'[s] testimony are solely within

54

the province of the jury." *Hunter v. State*, 397 Md. 580, 588 (2007) (quoting *Bohnert v.*

*State*, 312 Md. 266, 277 (1988)).  The general rule is that it is error for the court to permit

a witness to make a statement or express a belief or opinion to the effect that another

witness is telling the truth or lying.  *Hunter*, 397 Md. at 588 (citing *Bohnert*, 312 Md. at

277).  "Whether a witness on the stand personally believes or disbelieves testimony of a

previous witness is irrelevant, and questions to that effect are improper, either on direct or

cross-examination."  *Id.* at 589 (citation modified).  "Therefore, it is the well established

law of this State that issues of credibility and the appropriate weight to give a witness's

testimony are for the jury[,] and it is impermissible, as a matter of law, for a witness to give

an opinion on the credibility of another witness."  *Id.*

In *Hunter*, we cited, with approval, the Hawaii Supreme Court's reasoning for not

permitting "were-they-lying" questions:

> "Such questions, referred to as 'were-they-lying' questions, are
> improper for the following reasons: (1) they invade the province of the
> jury, as determinations of credibility are for the jury; (2) they are
> argumentative and have no probative value; (3) they create a risk that
> the jury may conclude that, in order to acquit the defendant, it must find
> that a contradictory witness has lied; (4) they are inherently unfair, as
> it is possible that neither the defendant nor the contradictory witness
> has deliberately misrepresented the truth; and (5) they create a 'no-win'
> situation for the defendant: if the defendant states that a contradictory
> witness is not lying, the inference is that the defendant is lying, whereas
> if the defendant states that the witness is lying, the defendant risks
> alienating the jury . . . ."

397 Md. at 589 (quoting *State v. Maluai*, 108 P.3d 974 (Haw. 2005)).  We proceeded to

apply these principles to the "were-they-lying" questions that the prosecutor asked of the

defendant.  We determined that the questions were impermissible as a matter of law.  We

55

also stated that when "prosecutors ask 'were-they-lying' questions, especially when they ask them of a defendant, they, almost always, will risk reversal." *Id.* at 596.

In this case, the prosecutor's question to Mr. Spicuzza was a classically impermissible "why-was-she-lying" question. It invaded the province of the jury to make Mr. Spicuzza assess his daughter's credibility and was improper as a matter of law. It was also irrelevant—whether Mr. Spicuzza personally believes or disbelieves his daughter's testimony is irrelevant. Not only was the question irrelevant, but it was inadmissible for other reasons, and therefore, was incompetent evidence. The question asked Mr. Spicuzza to speculate about H.'s opinions, motives, or thought processes. Mr. Spicuzza did not have personal knowledge about why his daughter would be lying, and it is therefore speculative.[11]

The State argues that the Appellate Court correctly determined that, even though the State's question was inadmissible, it was permitted under the circumstances because Mr. Spicuzza "opened the door" when he testified on direct examination that his daughter made a "vile, false statement."

---

[11] We reject the State's invitation that we infer from the record that Mr. Spicuzza had personal knowledge about why his daughter would be lying. The State suggests that it is reasonable to conclude from this record that Mr. Spicuzza had personal knowledge of H.'s motives because H. testified that prior to the sexual abuse, they had a close relationship, and she had called her father her "ride or die." We disagree with the State's position that it is "apparent" from the record that the State had a basis to believe that Mr. Spicuzza was positioned to know what motive H. had to lie. That H. testified that she was close with her father prior to the sexual abuse does not establish a foundation of personal knowledge by which Mr. Spicuzza could opine on his daughter's motive to lie under oath.

56

"Under the 'opening the door' doctrine, otherwise irrelevant evidence may be admitted when the opposing party has 'opened the door' to such evidence." *Grier v. State*, 351 Md. 241, 260 (1998) (first citing *Conyers v. State*, 345 Md. 525, 545 (1997); and then citing *Clark v. State*, 332 Md. 77, 84 (1993)). "Generally, 'opening the door' is simply a contention that competent evidence which was previously irrelevant is now relevant through the opponent's admission of other evidence on the same issue." *Grier*, 351 Md. at 260 (citation modified). "We have described the 'opening the door' doctrine as a rule of expanded relevancy that, under limited circumstances, 'allows the admission of evidence that is competent, but otherwise irrelevant.'" *Id.* (quoting *Conyers*, 345 Md. at 545). We have cautioned, however, that the "'opening the door' doctrine does not permit the admission of incompetent evidence." *Id.* at 260–61 (quoting *Conyers*, 345 Md. at 546). "Incompetent evidence refers to evidence that is inadmissible for reasons other than relevancy." *Id.* at 261. Accordingly, where the evidence is inadmissible for a reason other than relevancy, we have held that it is not admissible under the "opening the door" doctrine. *See id.* (holding that the State's evidence of the defendant's post-arrest silence was incompetent, not merely irrelevant, and consequently inadmissible under the "opening the door" doctrine); *Clark*, 332 Md. at 87 (holding that the defense's incompetent hearsay evidence was inadmissible to neutralize the State's prejudicial testimony).

Applying these principles here, the "opening the door" doctrine has no application to the "why-would-she-lie" question. As noted above, the question is improper for reasons other than simply being irrelevant. It was also (1) improper as a matter of law as it invades

57

the province of the jury to assess witnesses' credibility, and (2) incompetent because it is based upon speculation.  *See Bentley v. Carroll*, 355 Md. 312, 338 (1999).

To be sure, Mr. Spicuzza's testimony that H.'s testimony contained the "vile, false statement" that he sexually abused her was improper and inadmissible.  It expressed his belief that another witness, H., was lying.  The proper way for the prosecutor to have handled Mr. Spicuzza's non-responsive, improper, and inadmissible statement would have been to make an objection.  The trial judge could have then sustained the objection and instructed the jury to disregard Mr. Spicuzza's statement.  Instead of making an objection, the prosecutor asked a question that is classically improper as a matter of law.  This is not a scenario in which two wrongs make a right.  Our cases have never opened the door so far as to admit incompetent evidence.

### B. Harmless Error

Although we hold that the trial court erred in allowing the prosecutor to ask the "why-would-she-lie" question, we hold that, on this record, the error was harmless beyond a reasonable doubt.

In *Dorsey v. State*, 276 Md. 638, 658–59 (1976), this Court adopted the test for harmless error announced by the United States Supreme Court in *Chapman v. California*, 386 U.S. 18, 23 (1967).  As adopted in *Dorsey*, the harmless error rule is:

> [W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict.

58

276 Md. at 659. "In performing a harmless error analysis, we are not to find facts or weigh evidence." *Bellamy v. State*, 403 Md. 308, 332 (2008). "Instead, what evidence to believe, what weight to be given to it, and what facts flow from that evidence are for the jury to determine." *Id.* (citation modified). "Once it has been determined that error was committed, reversal is required unless the error did not influence the verdict; the error is harmless only if it did not play any role in the jury's verdict. The reviewing court must exclude that possibility beyond a reasonable doubt." *Id.* (citation modified).

We determine that the circuit court's error here satisfies the high threshold for harmless error. As discussed above, immediately before the prosecutor asked Mr. Spicuzza why his daughter was lying, Mr. Spicuzza had accused her, without objection, of making a "vile, false statement" that hurt him so deeply he could not even "describe it." He went further, telling the jury that he would not want them to feel what he felt and "wouldn't wish that upon anybody." Not only was it improper to ask why his daughter was lying, but it was also improper for Mr. Spicuzza to accuse his daughter of making a "vile, false statement." In other words, all of the testimony was improper. Had there been an objection, it should also have been stricken. But when asked why his daughter was lying, Mr. Spicuzza posited that it may have been because "she feels that I have destroyed her social life." Although the question was an improper one, the response was innocuous. Mr. Spicuzza was not caught without a response, he did not admit to an inability to identify a motive for her to lie, and he had already told the jury he believed she was lying. He also had testified on direct examination that H. protested his alleged prohibition of additional

59

overnight visits by A.L. and I.H. after the three girls left the apartment late at night without his permission.  The jury already knew from that testimony that H. allegedly had protested this change that Mr. Spicuzza made to her social life.

The trial court's error in not striking the improper question and answer was irrelevant in the context of the trial as a whole, especially concerning the otherwise overwhelming evidence against Mr. Spicuzza.

V

**Character Evidence**

Finally, we address Mr. Spicuzza's contention that the trial court erred in barring his character witnesses from testifying.  The State responds by pointing out that Mr. Spicuzza was not charged with an offense that would permit him to call character witnesses.

"We review a trial court's decision to admit or exclude a character witness's opinion for abuse of discretion." *Devincentz v. State*, 460 Md. 518, 539 (2018).  A trial court abuses its discretion when it adopts a view that no reasonable person would take. *Id.*  Determining whether the court abused its discretion "usually depends on the particular facts of the case and the context in which the discretion was exercised." *Id.* at 540 (citation modified).  In this case, the State also asserts that Mr. Spicuzza's character evidence was inadmissible under Maryland Rule 5-608.  Whether a witness's character for truthfulness has been attacked, such that Rule 5-608 is relevant, is a question of law, which we review de novo. *See Williams v. State*, 457 Md. 551, 562 (2018).

60

We start our analysis by noting that Mr. Spicuzza is not suggesting that his character for honesty was relevant to the charged offenses.[12] Mr. Spicuzza's evidence for his honest character was therefore only admissible by virtue of his status as a witness and as a result of the prosecutor's cross-examination of him.

Of course, like every other witness, a criminal defendant who takes the stand can be impeached with evidence that he or she has a "bad character for veracity." Joseph F. Murphy, Jr. & Erin C. Murphy, *Maryland Evidence Handbook*, § 509[A] at 261 (5th ed. 2000, 2024 Cum. Supp.); *see* Md. Rule 5-404(a)(3) ("Evidence of the character of a witness with regard to credibility may be admitted under Rules 5-607, 5-608, and 5-609.").

Our case law is clear that where a criminal defendant is on trial for a veracity impeaching offense,[13] the defendant may offer evidence of his or her good character for truthfulness after he or she testifies. *Sahin v. State*, 337 Md. 304, 307 (1995); *Sippio v.*

---

[12] Maryland Rule 5-404(a)(1)(A) gives criminal defendants the right to offer evidence of their good character for relevant character traits involving the charged crimes. In such instances, the defendant is not required to testify in order to introduce evidence of his or her good character for the relevant trait involved in the crime. Joseph F. Murphy, Jr. & Erin C. Murphy, *Maryland Evidence Handbook*, § 509[A] at 260–61 (5th ed. 2000, 2024 Cum. Supp.).

[13] Veracity impeaching offenses are infamous crimes or other crimes relevant to credibility as used in Maryland Rule 5-609. *Sahin v. State*, 337 Md. 304, 307 n.1 (1995). "That is, those crimes which are so relevant to credibility that convictions of the crime may be used to attack the credibility of a witness." *Id.* They include "crimes in the nature of perjury or subordination of perjury, false statement, criminal fraud, embezzlement, false pretense, or any other offense involving some element of deceitfulness, untruthfulness, or falsification bearing on a witness's propensity to testify truthfully." *Id.* at 312 (citation modified). Mr. Spicuzza is not alleging that the statutory crimes for which he was charged—sexual abuse of a minor, second-degree rape, and third-degree sexual offense— qualify as veracity impeaching offenses.

*State*, 350 Md. 633, 664 (1998). In *Sahin*, we were asked to decide whether to abandon the majority view of most states by holding that a criminal defendant could call character witnesses to testify to his or her character trait for honesty where (1) the underlying crime is a veracity impeaching offense, and (2) after the defendant takes the stand and is subject to cross-examination. After noting that Federal Rule of Evidence 608 did not permit the admission of character evidence of truthfulness simply because the defendant testified, we similarly noted that "state courts construing a corresponding rule also hold that the mere fact that the defendant takes the stand does not constitute an attack on his credibility." *Sahin*, 337 Md. at 316 (citation modified).

In adopting the minority view, we concluded that the charging document and the prosecutor's evidence that the defendant committed a veracity impeaching offense is an attack on the defendant's character for truthfulness. *Id.* at 322. Thus, just as a defendant is entitled to introduce evidence of character as a defense to a charge, *see* Md. Rule 5-404(a)(1)(A), we explained that a criminal defendant on trial for a veracity impeaching offense who testifies should be able to present favorable evidence on his or her character for truthfulness. *Sahin*, 337 Md. at 322. In *Sippio*, we made it clear that the trial judge may require that the defendant testify before calling favorable "character for veracity" witnesses. 350 Md. at 664.

"Unless 'veracity' is a relevant character trait of the crime for which the criminal defendant is on trial, however, the defendant's appearance on the stand does not—of itself—'open the door' to evidence of the defendant's character for the relevant character trait." *Maryland Evidence Handbook*, § 509[A] at 261; *see also Sahin*, 337 Md. at 319

("Generally, contradiction is not an attack on character for truthfulness[.]"); *Sippio*, 350 Md. at 663 (explaining that the mere fact "that the State's witnesses contradicted the defendant's testimony" does not "constitute an attack sufficient to allow such character testimony").

Mr. Spicuzza argues that a prosecutor's direct attacks through cross-examination of a defendant can transcend mere contradiction and constitute impeachment on material facts akin to attacking a witness's character for truthfulness. He contends that these principles were articulated by this Court over 150 years ago in *Davis v. State*, 38 Md. 15 (1873). He also contends that, in the context of the corresponding federal rule, in *United States v. Dring*, the Court of Appeals for the Ninth Circuit recognized that a witness's character trait for truthfulness is admissible if a direct attack through cross-examination includes "strong accusations of misconduct and bad character." 930 F.2d 687, 690–91 (9th Cir. 1991) (quoting McCormick § 49 at 117 (3d ed. 1984)); *but see*, *e.g.*, *United States v. Danehy*, 680 F.2d 1311, 1314 (11th Cir. 1982) ("The mere fact that a witness is contradicted by other evidence in a case does not constitute an attack upon his reputation for truth and veracity.").

Mr. Spicuzza also points out that the Advisory Committee note to Federal Rule of Evidence 608(a)—from which our Rule 5-608 is derived—states that "[w]hether evidence in the form of a contradiction is an attack upon the character of the witness must depend on the circumstances." Applying these principles, Mr. Spicuzza acknowledges that, although merely contradicting a witness may not put their character at issue, if a prosecutor, through an aggressive cross-examination, generates "many and material" contradictions, the cross-examination may have the effect of transforming mere contradictions into an

63

attack on his or her character for truthfulness, and therefore make character evidence for truthfulness relevant and admissible.

Unsurprisingly, the State disagrees with Mr. Spicuzza's interpretation. The State points out that *Davis* was decided 100 years before our codification of the Maryland Rules of Evidence. The State asserts that Mr. Spicuzza's interpretation is inconsistent with the plain language and structure of Rule 5-608(a), as well as with our case law in which we permit character evidence for truthfulness after a criminal defendant testifies only when the defendant is on trial for veracity impeaching offenses. *See Sahin*, 337 Md. at 307; *Sippio*, 350 Md. at 664. Moreover, the State asserts, even if the Court were willing to expand the admissibility of character evidence beyond the narrow circumstances envisioned under Rule 5-608(a), the prosecutor's cross-examination of Mr. Spicuzza did not transform mere contradiction into an attack on his general character for truthfulness.

We start our examination of the parties' contentions with the plain language of Maryland Rule 5-608(a), which states:

> (1)  In order to attack the credibility of a witness, a character witness may testify (A) that the witness has a reputation for untruthfulness, or (B) that, in the character witness's opinion, the witness is an untruthful person.
>
> (2)  After the character for truthfulness of a witness has been attacked, a character witness may testify (A) that the witness has a good reputation for truthfulness or (B) that, in the character witness's opinion, the witness is a truthful person.

Examining the structure of the subsections together, it is clear that (a)(1) defines what is meant by an "attack" for purposes of (a)(2). An "attack" on credibility, according to (a)(1), is where a character witness testifies "that the witness has a reputation for

untruthfulness" or opines that the "witness is an untruthful person." Md. Rule 5-608(a). Under (a)(2), "[a]fter the character for truthfulness has been attacked" in that manner, the defendant can offer character evidence of his truthfulness in rehabilitation. In other words, the rehabilitation evidence is in direct response to the introduction of reputation or opinion evidence that the witness is untruthful.

Under the plain and unambiguous language of subsection (a), as well as its structure, character evidence is admissible as rebuttal evidence after a *character witness* testifies and attacks a defendant's character for truthfulness. We further observe that the history of the rule supports our interpretation. From 1988 until 1993, Rule 5-608(a)(1) was more broadly phrased than the current rule, with the last clause of the subsection stating that "evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence *or otherwise.*" (emphasis added). The minutes from a 1988 Rules Committee meeting reflect that Judge Howard S. Chasanow observed that "what constitutes an 'attack' on the character of the witness has been open to interpretation, both under the Rule and common law." Judge Chasanow added that "courts have not been uniform" and "different results may depend on the kind of attack, *i.e.*, if it goes to truthfulness rather than accuracy." These observations prompted a "discussion as to whether this problem could be resolved by changing the language of the rule." The Committee also decided to "research the meaning of 'or otherwise' under federal case law."

When Rule 5-608(a) was taken up by the Rules Committee in 1993, the phrase "or otherwise" was omitted. The above discussion reflects that the omission was an intentional

65

attempt to narrow what constitutes an "attack" and to avoid ambiguity in the rule. In a 1993 Report, the Rule's Committee noted that the corollary federal rule was "generally consistent" with Maryland law and indicated that (a)(1) and (2) are related in that they contain the same "three essentials" as the federal rule:

> (1) the evidence must be in the form of opinion or reputation; (2) the evidence must relate to the previous witness's general character for truthfulness or untruthfulness; *not whether the witness is being truthful in the action being tried*; and (3) rehabilitation by evidence of truthful character is only permitted after the previous witness's veracity has been attacked.

(Emphasis added). The above rules history confirms our interpretation of the existing rule—character evidence for truthfulness under Rule 5-608(a)(2) is impermissible if the attack on a witness's credibility is merely a challenge to whether the witness is being truthful in the action being tried.

Our interpretation is also consistent with the principles articulated in our case law, which permit a defendant who is charged with a *veracity impeaching offense* to admit evidence of his or her character for truthfulness after he or she is subject to cross-examination. *See Sahin*, 337 Md. at 307; *Sippio*, 350 Md. at 664. In those cases—which were decided after Rule 5-608 was revised—we expressly limited the defendant's ability to introduce character evidence for truthfulness to cases in which the defendant was charged with veracity impeaching offenses, and only after the defendant testified. Our rationale in those cases was that prior to the defendant taking the stand, the defendant's character for truthfulness is not relevant because the defendant has not placed his or her veracity in question. *Sippio*, 350 Md. at 663–64 (citing *Sahin*, 337 Md. at 322). Our

holding in those cases was expressly limited to a defendant who is accused of a veracity impeaching offense. The distinction that we made in those cases does not support Mr. Spicuzza's contention that Rule 5-608(a)(2) permits a criminal defendant who has not been accused of a veracity impeaching offense to introduce evidence of his good character simply because he was subject to cross-examination in which the prosecutor drew out inconsistencies between his testimony in this case and that of other witnesses.

Nor do we find support in the cases Mr. Spicuzza cites—*Davis*, 38 Md. 15 (1873) and *Dring*, 930 F.2d 687 (1991). *Davis* was decided at a time when Maryland law did not permit opinion evidence on a witness's character trait for honesty. *See Jensen v. State*, 355 Md. 692, 701 (1999) (explaining that prior to the enactment of CJ § 9-115,[14] "a character witness could testify only as to what he heard from others about the defendant's reputation, and not to his opinion of the witness's truthfulness[]"). It was only after the enactment of CJ § 9-115 in 1971 that a character witness could offer "evidence to prove character based on personal opinion." *Jensen*, 355 Md. at 701 (quoting 1971 Md. Laws, Ch. 760, at 1634); *see also Devincentz*, 460 Md. at 541 (quoting *Durkin v. State*, 284 Md. 445, 448–49 (1979)) (noting that CJ § 9-115 "modified the traditional rule limiting a character witness's testimony about another witness's character for truthfulness to testimony about the 'general

---

[14] CJ § 9-115 states:

Where character evidence is otherwise relevant to the proceeding, no person offered as a character witness who has an adequate basis for forming an opinion as to another person's character shall hereafter be excluded from giving evidence based on personal opinion to prove character, either in person or by deposition, in any suit, action, or proceeding, civil or criminal, in any court or before any judge, or jury of the State.

reputation in the community for veracity of the witness under attack[]'"). Because opinion evidence of Mr. Spicuzza's character for truthfulness would not have been admissible at the time that *Davis* was decided, we determine that it has no application here.

In *Dring*, the Ninth Circuit Court of Appeals held that the district court did not err in denying the defendant's request to present rehabilitative testimony. 930 F.2d at 692. In so holding, the court pointed out that the government did not "introduce opinion or reputation testimony to attack" the defendant's "general character for truthfulness[,]" and it did not "present evidence of prior misconduct or corruption." *Id.* Instead, the court explained, the government "merely emphasized inconsistencies between [the defendant's] testimony and that of other witnesses." *Id.* The court noted that "[v]igorous cross-examination, including close questioning of a witness about his version of the facts and pointing out inconsistencies with the testimony of other witnesses, does not necessarily trigger rehabilitation." *Id.* at 691. The court cited *McCormick on Evidence* § 49 for the proposition that a vigorous cross-examination or the presentation of contradictory evidence *could* trigger rehabilitation evidence "where such evidence amounts to the kind of indirect attack on truthfulness embodied by evidence of bad reputation, bad opinion of character for truthfulness, conviction of crime, or eliciting from the witnesses on cross-examination acknowledgement of misconduct which has not resulted in the conviction." *Id.* at 693; *see also McCormick on Evidence*, ch. 5 § 47 (2025) (citing *Dring* for the proposition that "if the adversary has merely introduced evidence contradicting the facts to which the witness testified, most cases forbade a showing of the witness's good character for truthfulness[]"); *see also State v. Madigan*, 122 A.3d 517, 524 (Vt. 2015) ("The critical question is whether the attack on the witness's

credibility suggests that the witness is lying *in this case*, or whether it goes further and attempts to show that the witness has a *general character* for dishonesty.").

Even if we were to agree with Mr. Spicuzza that our rules permit the introduction of character evidence for honesty in extraordinary circumstances in which the cross-examination of the defendant did not simply reveal inconsistencies but was tantamount to an attack on the defendant's general character for truthfulness, that did not occur here.

In support of his assertion that an aggressive cross-examination was tantamount to an attack on his general character for truthfulness, Mr. Spicuzza points to the following evidence: (1) the prosecutor's question regarding "why would H. lie"; (2) the discrepancy between H.'s testimony that Mr. Spicuzza bought her the sex toys, and his testimony that he bought the sex toys for his ex-girlfriend; and (3) the discrepancy between his testimony that he told H.'s friends' parents about his work schedule and that the girls would be left alone after he left for work at 3:30 a.m.

When the prosecutor cross-examined Mr. Spicuzza about H.'s motive to lie and whether Mr. Spicuzza purchased the sex toys, the prosecutor was attacking the strength of the defense's case on non-material points without impugning Mr. Spicuzza's general character for truthfulness. During cross-examination, the prosecutor countered Mr. Spicuzza's belief that H. fabricated the sexual abuse allegations because he told her that her friends could not come over anymore by asking Mr. Spicuzza questions that demonstrated that he relented and allowed A.L. to return to his home. In addition, after H. testified that Mr. Spicuzza bought her "sex toys" for her birthday, during the prosecutor's cross-examination of Mr. Spicuzza, the prosecutor drew out Mr. Spicuzza's contradictory

69

testimony that he bought the sex toys for his ex-girlfriend. Simply put, the prosecution's cross-examination did not rise to the level of an attack on Mr. Spicuzza's general character for dishonesty, as opposed to a typical cross-examination in which the prosecutor attempted to establish contradictions between Mr. Spicuzza's version of the facts and the accounts of those same facts by other witnesses.

Other inconsistencies were brought out not during Mr. Spicuzza's cross-examination, but in statements made by other witnesses. For example, Mr. Spicuzza testified during his direct examination that he did not know how to use an iPhone, and therefore, could not have deleted photographs from H.'s cellphone. Later, when his mother testified, she revealed that after Mr. Spicuzza's cell phone was seized, he asked his mother if he could borrow her iPhone "so he could call work." In contrast to evidence that a criminal defendant has a general character for untruthfulness, these inconsistencies are classic types of contradictions that arise when a criminal defendant who testifies on his own behalf has a "distinct pro-defense bias and a compelling interest in the outcome of the case." *Dring*, 930 F.2d at 692.

In rebuttal, the prosecutor called A.B.'s father and A.L.'s parents, who testified that Mr. Spicuzza never mentioned his work schedule to them. Similarly, H.'s mother testified and provided contradictory testimony about the meeting that she and H. had with Mr. Spicuzza in the Walmart parking lot. Once again, these examples simply reflect that the State's witnesses contradicted the defendant's testimony and did not constitute an "attack on [the] defendant's character for truthfulness sufficient to permit the defendant to introduce evidence of good character for truthfulness." *Sahin*, 337 Md. at 316. Based upon

70

our review of the record, we find no error in the circuit court's refusal to permit Mr. Spicuzza to introduce character witnesses in this case to testify to his general character trait of honesty.

We further determine that, even if rehabilitation evidence had been admissible, the circuit court did not abuse its discretion in refusing to permit Mr. Spicuzza's character witnesses to testify because the proffers lacked the necessary information or detail to establish that the witnesses had sufficient personal knowledge to opine about his honest character.

According to Mr. Spicuzza, to offer character evidence for truthfulness, the proponent needs "merely to elicit proof of how long and how well the witness has known the individual." In Mr. Spicuzza's view, the nature of his relationships with his witnesses—his parents, brother, and friends—"presupposed their personal knowledge," obviating the need for a more detailed proffer. We disagree.

Presupposition does not satisfy the "core requirement" that, for a witness to offer a "personal assessment of another's character[,]" "the witness must have personal knowledge of the individual." *Devincentz*, 460 Md. at 544; *see also* CJ § 9-115 (stating that a character witness needs "an adequate basis for forming an opinion as to another person's character"). "A witness has an adequate basis for personal opinion character testimony when the witness has regular contact with the person whose character she is evaluating *and* has reason to believe that the person" has or has not "been truthful." *Devincentz*, 460 Md. at 545 (emphasis added). "[T]he extent of the basis for the personal opinion character testimony relates to admissibility, and not just to the weight to be given to the testimony by the trier of fact." *Durkin*, 284 Md. at 453.

71

The trial court determined that Mr. Spicuzza's proffers were aimed more toward his initial requests for character evidence about his appropriateness with children and general law-abiding nature, and not his honesty. Moreover, as the proffers pertained to honesty, the trial court found that "every single one of them was a conclus[ory] statement that Mr. Spicuzza was an honest person, he's trustworthy." Those bare-bones proffers, the trial court concluded, did not provide it with enough "detail" or "information" to assess whether the witness's testimony "would be appropriate or not" because it included "no information as to the basis for their opinion."

Based upon our review of the proffers, we agree that the proffers are virtually all the same and were geared toward his appropriateness with children, focused on how the witnesses interacted with him, and the length of time they had known him. They did not relay any connection to honesty. Accordingly, even assuming that the State had placed Mr. Spicuzza's character for honesty in question, the trial court did not abuse its discretion in refusing to allow Mr. Spicuzza to present evidence of his honest character based upon the proffers.

## VI

## Conclusion

In conclusion, we hold that (1) the circuit court did not err in admitting other bad acts evidence under the common scheme or plan exception set forth in Maryland Rule 5-404(b); (2) although the trial court erred in overruling the objection to the State's "why-was-she-lying" question, on this record, the error was harmless beyond a reasonable doubt;

72

and (3) the circuit court did not err in refusing to allow Mr. Spicuzza to present evidence of his honest character.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED. COSTS TO BE PAID BY THE PETITIONER.**

73

Circuit Court for St. Mary's County
Case No. C-18-CR-22-000283

Argued: December 5, 2025

IN THE SUPREME COURT

OF MARYLAND

No. 25

September Term, 2025

_____

BRIAN S. SPICUZZA

v.

STATE OF MARYLAND

_____

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Killough,

JJ.

_____

Concurring and Dissenting Opinion by Watts, J.

_____

Filed: July 28, 2026

Respectfully, I concur in part and dissent in part. I agree with the Majority's holding that the Circuit Court for St. Mary's County erred in overruling Mr. Spicuzza's objection to the "why-was-she-lying" question that the State asked Mr. Spicuzza during his cross-examination, and did not err in refusing to allow Mr. Spicuzza to present character witnesses to attest to his honest character. See Maj. Slip Op. at 2-3, 72-73. I part ways with the Majority with respect to its conclusion that evidence of other bad acts concerning Mr. Spicuzza's alleged sexual abuse of his daughter's friends was admissible under Maryland Rule 5-404(b)'s "common scheme or plan" exception to show Mr. Spicuzza's plan to sexually abuse his daughter and her friends in his apartment. See Maj. Slip Op. at 2, 72. I would hold that the circuit court erred in admitting evidence of other bad acts relating to the sexual abuse of friends of Mr. Spicuzza's daughter under the "common scheme or plan" exception in Maryland Rule 5-404(b).[1] I write separately to explain why.

---

[1] Unlike the Majority, I would hold that the issue of whether evidence of Mr. Spicuzza's alleged misconduct with and sexual abuse of his daughter's, the victim's, friends was admissible was preserved for appellate review with respect to both the testimony of A.L. and A.B. See Maj. Slip Op. at 30-31. The Majority holds that Mr. Spicuzza preserved an objection to all of A.L.'s testimony but with respect to A.B. preserved an objection only to her testimony "that Mr. Spicuzza provided them with alcohol, vapes, and marijuana, and that I.H. was present and partook in the use of those substances[.]" Maj. Slip Op. at 30-31. I agree with the Appellate Court that the record demonstrates the trial court knew defense counsel's continuing objection was to *all* other crimes evidence. See Spicuzza v. State, No. 808, Sep. Term, 2023, 2025 WL 782335, at *3 n.2 (Md. App. Ct. Mar. 12, 2025). During A.B.'s testimony, the following colloquy occurred:

[DEFENSE COUNSEL]: I just assume Your Honor is ready for a continuing objection to the 404(b) motion. Is that correct?

THE COURT: Yes.

First, it is helpful to briefly review Maryland Rule 5-404(b) and relevant case law about the Rule. Maryland Rule 5-404(b) provides:

> Evidence of other crimes, wrongs, or other acts . . . is not admissible to prove the character of a person in order to show action in the conformity therewith. Such evidence, however, may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, absence of mistake or accident, or in conformity with Rule 5-413.[2]

In <u>Browne v. State</u>, 486 Md. 169, 187, 305 A.3d 445, 455 (2023), we explained that "[t]he rationale behind the exclusion of other bad acts evidence when it is offered to show propensity is not that such evidence is irrelevant or has no probative force." (Citation modified). Indeed, other bad acts evidence "has admitted probative value." <u>Id.</u> at 187, 305 A.3d at 455 (citation modified). Maryland Rule 5-404(b) is thus "grounded in the reality that substantive and procedural protections are necessary to guard against the potential misuse of other crimes or bad acts evidence and avoid the risk that the evidence will be used improperly by the jury against a defendant." <u>Id.</u> at 187, 305 A.3d at 455 (citation modified). "The overarching concern is that the jury may use evidence of crimes that are

---

[THE STATE]: Yes.

THE COURT: *I said that.*

(Emphasis added). The circuit court's response demonstrates that, as far as it was concerned, Mr. Spicuzza's counsel had already established a continuing objection to A.B.'s testimony.

[2]Maryland Rule 5-413 provides that, "[i]n prosecutions of sexually assaultive behavior as defined in Code, Courts Article, § 10-923(a), evidence of other sexually assaultive behavior by the defendant occurring before or after the offense for which the defendant is on trial may be admitted in accordance with § 10-923."

not the subject of the trial to conclude that the defendant is a bad person and, therefore, should be convicted of the charges for which the defendant is on trial for that reason, rather than based on evidence specific to those charges." Id. at 187-88, 305 A.3d at 455 (citation modified).

With respect to the exceptions in Maryland Rule 5-404(b), we stated that the "admissibility of evidence of other bad acts is not confined to a finite list of exceptions[,]" and, instead, "all evidence with sufficient relevance, other than merely by showing criminal character, may be admissible." Id. at 189, 305 A.3d at 456 (citation modified). To that end, the exceptions identified in Maryland Rule 5-404(b) are "merely examples, honed over the course of centuries of development of this common law evidentiary principle, of those areas where evidence has most often been found admissible even though it discloses other bad conduct." Id. at 189, 305 A.3d at 456 (citation modified). With respect to the common plan or scheme exception in Maryland Rule 5-404(b), the Appellate Court of Maryland has stated that "Maryland courts have recognized two ways by which other crimes evidence may fall within" the exception: (1) the evidence is of "a *modus operandi*, which is but one means of establishing identity"; or (2) the evidence is "of a plan to commit one offense as part of a grand scheme to commit others." Hart v. State, 260 Md. App. 491, 528, 310 A.3d 1157, 1178 (2024) (citation modified).

We have explained that the proponent of other bad acts evidence must fulfill three requirements before such evidence may be admitted: "(1) the evidence must be specially relevant; (2) the defendant's involvement must be proved by clear and convincing evidence; and (3) the necessity for and probative value of the evidence must not be

substantially outweighed by the risk of unfair prejudice." Browne, 486 Md. at 190, 305 A.3d at 457 (citation omitted). As to the first requirement, we have stated that "the evidence must be substantially relevant to some contested issue in the case and not offered to prove the defendant's guilt based on propensity to commit crime." Id. at 190, 305 A.3d at 457 (citation modified). One non-propensity purpose for which other bad acts evidence may be admitted is the exception set forth in Maryland Rule 5-404(b)—common scheme or plan. See id. at 191, 305 A.3d at 457. Significantly, even where a non-propensity purpose is implicated, "a court may not admit other bad acts evidence if the primary inference to be drawn from it depends on propensity reasoning." Id. at 191, 305 A.3d at 457. If a trial court determines that other bad acts evidence is specially relevant, then the second requirement for admission is that the defendant's "involvement in the other bad act(s) must be established by clear and convincing evidence." Id. at 193, 305 A.3d at 458 (citation omitted). And, "[i]f the first two requirements are satisfied, the trial court must still weigh the necessity for and probative value of the evidence against the danger of unfair prejudice that would result from its admission[,]" and should exclude the evidence where the "danger substantially outweighs the necessity for and probative value of the evidence[.]" Id. at 193, 305 A.3d at 458-59.

In this case, I would conclude that the circuit court erred in admitting evidence of other crimes or other bad acts evidence of Mr. Spicuzza's alleged sexual abuse and misconduct with his daughter's friends under the common scheme or plan exception of Maryland Rule 5-404(b). Such evidence was not specially relevant to establishing a common scheme or plan. The sexual abuse of Mr. Spicuzza's daughter occurred over a

period of two years and began before any of Mr. Spicuzza's alleged misconduct with his daughter's friends and was unrelated to later separate incidents of alleged sexual abuse and other misconduct involving his daughter's friends. Although Mr. Spicuzza may have engaged in a common scheme or plan to commit sexual abuse of his daughter's friends and evidence of other bad acts involving his daughter may have been admissible at a trial in which the friends were the alleged victims, this does not mean that evidence of bad acts relating to the abuse of his daughter's friends was admissible at a trial in which his daughter was the alleged victim. The fact that a person may have developed a scheme or plan to commit similar offenses against certain victims does not tend to prove that the person acted in conformity with a common scheme or plan in committing earlier offenses or offenses involving other victims. Mr. Spicuzza's sexual abuse of his daughter and his alleged sexual misconduct involving her friends are not acts that "are naturally to be explained as caused by a general plan of which they are individual manifestations[,]" Cross v. State, 282 Md. 468, 475, 386 A.2d 757, 762 (1978) (citation modified), where Mr. Spicuzza's abuse of his daughter had been occurring for years before his daughter's friends were invited over.

Mr. Spicuzza's alleged sexual abuse and misconduct with his daughter's friends on separate occasions do not relate to his sexual abuse of his daughter such "that proof of one tends to establish the other." Id. at 475, 386 A.2d at 762 (citations omitted). This is especially so where, during Mr. Spicuzza's sexual abuse of his daughter during the time after he moved into his apartment, his daughter's friends were not present when the sexual abuse is alleged to have occurred, the friends have no firsthand knowledge of the abuse that occurred, and initially the abuse of the friends had not yet begun. Mr. Spicuzza's abuse

- 5 -

of his daughter is separate and independent from the incidents described by his daughter's friends. That Mr. Spicuzza provided intoxicants to his daughter and her friends before engaging in sexual abuse conduct on separate, unrelated occasions does not mean that his actions were part of a general plan to sexually abuse his daughter. There is simply not a "relationship between the time, place, circumstances or parties involved in the crimes[,]" *i.e.*, Mr. Spicuzza's sexual abuse of his daughter and his alleged other bad acts involving his daughter's friends, to support an "inference that there exists a single inseparable plan encompassing both the charged and uncharged crimes[.]" Id. at 475-76, 386 A.2d at 762 (citation modified). Mr. Spicuzza's alleged criminal conduct with his daughter's friends on separate instances when they were present in his apartment fails to establish that there was a connection or continuing transaction or act that involved sexually abusing his daughter at other times when her friends were absent and before the abuse of the friends began.

Similarities in the offenses Mr. Spicuzza was alleged to have committed against his daughter and her friends are not sufficient to establish that a common scheme or plan existed such that evidence of his other bad acts with his daughter's friends was specially relevant. We have recognized that "[t]he concurrence of common features . . . must be more than simply a manner of operation, which is possessed to some extent by most criminal recidivists." Id. at 475, 386 A.2d at 762. "A method of operation is not, by itself, a common scheme, but merely a repetitive pattern." Id. at 475, 386 A.3d at 762 (citation

omitted).[3] I agree with the Appellate Court's conclusion that evidence of Mr. Spicuzza's bad acts committed with A.L. and A.B. was not specially relevant for purposes of proving Mr. Spicuzza's proclivity for committing acts of sexual abuse with H. and was not admissible under the common scheme or plan exception in Maryland Rule 5-404(b). See Spicuzza v. State, No. 808, Sep. Term, 2023, 2025 WL 782335, at *4-*5 (Md. App. Ct. Mar. 12, 2025). As the Appellate Court pointed out, "H.'s allegations dated back to when Mr. Spicuzza lived with his parents, a time *before* A.L. and A.B. came into the picture." Id. at *5. In short, like the Appellate Court, I would conclude that evidence of other bad acts involving his daughter's friends was not evidence of a common scheme or plan and therefore was inadmissible.

Moreover, although evaluation of the admissibility of the bad acts evidence could stop with the determination that the evidence failed to satisfy any exception for

---

[3]As Mr. Spicuzza aptly states on brief: "Unlike stealing explosives to detonate a safe, or tax evasion to hide illegal proceeds, a repetitive pattern in sex offense cases does not prove a grand plan and thus is not common scheme evidence." In so stating, Mr. Spicuzza refers to McKinney v. State, 82 Md. App. 111, 124, 570 A.2d 360, 366 (1990), a case in which the Appellate Court gave "theft of nitroglycerine for use in blowing open a safe" as an example of "a plan to commit one offense as part of a grand scheme to commit others[.]" And, the Appellate Court stated that in the sense of a grand scheme, "the other crimes evidence in a separate prosecution of appellant for sexual contact with one child—evidence of similar conduct with a different child—would not be relevant because it would not tend to prove that kind of common scheme." Id. at 124, 570 A.2d at 366. Mr. Spicuzza also refers to United States v. Whitworth, 856 F.2d 1268, 1270 (9th Cir. 1988), a case in which the defendant sold classified Navy communications and was charged with both espionage and tax evasion and the offenses were joined at trial. With respect to the defendant's claim on appeal that the offenses were misjoined for trial, the United States Court of Appeals for the Ninth Circuit affirmed the trial court's ruling that joinder was proper because "the offenses were performed as part of a common plan" and the "tax evasion flow[ed] directly from other criminal activity and such evasion result[ed] in large part from the necessity of concealing the illegal proceeds of that activity[.]" Id. at 1277.

- 7 -

admissibility under Maryland Rule 5-404(b), I would conclude that any probative value of A.L.'s and A.B.'s testimony was outweighed by the danger of unfair prejudice. Even under the Majority's holding that Mr. Spicuzza failed to preserve an objection to the entirety of A.B.'s testimony, the danger of unfair prejudice from the admission of testimony from A.L. regarding her experiences with Mr. Spicuzza outweighed its probative value. In this case, the circuit court permitted the State to introduce evidence of other bad acts involving sexual abuse of another victim which established Mr. Spicuzza's propensity to commit acts of sexual abuse against his daughter.

In addition, it cannot be said that the admission of the prior bad acts evidence did not influence the verdict and was harmless beyond a reasonable doubt. The primary issue in this case was whether Mr. Spicuzza sexually abused his daughter at all. Mr. Spicuzza denied that he abused anyone. So, the State's case rested primarily on the jury's credibility assessments of Mr. Spicuzza and his daughter and who it believed. It is entirely possible that a jury could have found that Mr. Spicuzza's daughter's testimony was more credible than Mr. Spicuzza's because of her friends' testimony about their alleged experiences with Mr. Spicuzza. The friends' testimony bolstered the State's case because it suggested that, if Mr. Spicuzza committed criminal offenses against his daughter's friends, then it was likely that he also must have abused his own daughter. Stated otherwise, the jury easily could have concluded, based on the friends' testimony, that Mr. Spicuzza had a propensity to commit sexual abuse of young girls, which is obviously what Maryland Rule 5-404(b) aims to protect against. See Browne, 486 Md. at 187, 305 A.3d at 455 ("[O]ther bad acts evidence is inadmissible when it is offered to suggest that because the defendant is a person

of criminal character, it is more probable that the defendant committed the crime for which the defendant is on trial." (Citation modified)).

In my view, the State's contention that A.L.'s testimony was cumulative to the alleged unobjected to testimony of the daughter and A.B. (the other friend) and therefore was harmless is not persuasive. The testimony of the two friends was not altogether the same. A.L.'s testimony provided a different, more detailed account of Mr. Spicuzza's alleged bad acts than that provided by other witnesses and included detailed testimony about the alleged sexual abuse of her by Mr. Spicuzza. Moreover, to the extent that it could be said that A.L.'s testimony was merely cumulative of A.B.'s, the alleged cumulative nature of the testimony was itself prejudicial where the case turned solely on the credibility of the State's witnesses and Mr. Spicuzza. It is simply not possible to conclude beyond a reasonable doubt that the inadmissible bad acts evidence did not influence the jury's verdict.[4]

For the above reasons, respectfully, I concur in part and dissent in part.

---

[4]Because I would reverse Mr. Spicuzza's convictions based on the inadmissibility of the other bad acts evidence, it is not necessary for me to address whether the trial court's error in overruling Mr. Spicuzza's objection to the "why-was-she-lying" question was harmless beyond a reasonable doubt.

Circuit Court for Saint Mary's County
Case No.: C-18-CR-22-000283
Argued: December 5, 2025

IN THE SUPREME COURT

OF MARYLAND

No. 25

September Term, 2025

BRIAN S. SPICUZZA

v.

STATE OF MARYLAND

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Killough,

JJ.

Concurring and Dissenting Opinion by Biran, J.,
which Gould and Eaves, JJ., join.

Filed: July 28, 2026

I agree with the Majority that the trial court did not err in admitting other bad acts evidence under the common scheme or plan exception. *See* Maj. Slip Op. at 49-52.[1] I also agree that the trial court did not err in refusing to permit Mr. Spicuzza's character witnesses to testify as to his honest character. *See* Maj. Slip Op. at 60-72. However, I disagree with the Majority's determination that the trial court erred in allowing the prosecutor to ask Mr. Spicuzza why H. was lying about Mr. Spicuzza having sexually abused her. *See* Maj. Slip Op. at 53-58.[2] Regardless, I agree that any error in allowing this testimony was harmless beyond a reasonable doubt. *See* Maj. Slip Op. at 58-60.

Accordingly, I respectfully concur in part and dissent in part, and I concur in the judgment affirming Mr. Spicuzza's convictions.

**I**

In her opening statement, the prosecutor told the jury, "[t]his case is about you … weighing the credibility of the witnesses." Defense counsel struck a similar note in his opening statement, telling the jury that H.'s accusations were "not true" and that Mr. Spicuzza was "falsely and wrongly accused[.]" Defense counsel previewed that Mr. Spicuzza would be testifying in his defense, thereby exposing "his entire life and word and body" to the jury.

---

[1] I also agree with the Majority's discussion concerning preservation with respect to the common scheme or plan evidentiary issue. *See* Maj. Slip Op. at 25-31.

[2] When I refer to the "Majority's" determination that the trial court erred in allowing the prosecutor to ask the why-is-your-daughter-lying question, I mean the determination made by Chief Justice Fader and Justice Booth, who join the latter's opinion in full, and by Justice Watts and Justice Killough, who agree that the trial court erred in allowing this inquiry on cross-examination of Mr. Spicuzza.

After the State concluded its case-in-chief, Mr. Spicuzza testified in his defense. Mr. Spicuzza testified that, after learning that H., A.L., and I.H. left the apartment late at night without his permission, he prohibited I.H. and A.L. from returning for overnight visits. After defense counsel asked Mr. Spicuzza whether H. complained about that decision, Mr. Spicuzza answered that H. did not protest initially but that she did so later.

Mr. Spicuzza denied that he ever gave alcohol to a minor in his apartment or purchased alcohol for a minor. He denied that he ever provided marijuana or vapes to any minor. He denied prohibiting H. and her friends from taking videos or photographs in his apartment. He denied showing pornography to H. or her friends. And he denied engaging in any sexual activity or other inappropriate conduct with H. or her friends.

After defense counsel concluded his questioning about the evidence the State had introduced during its case-in-chief, eliciting the denials from Mr. Spicuzza summarized above, the following colloquy occurred:

> DEFENSE COUNSEL: [S]ir, I think this might be my last question, okay? When you heard your daughter tell this jury all of those things that she said you did to her sexually, how did you feel? Tell the truth.
>
> MR. SPICUZZA: I – it – it's indescribable. I don't know if any of you have children, but I don't even think you could imagine what that feels like to sit here and listen to that. That is disgusting to hear that vile, false statement come from your daughter. I can't – I can't describe it. Nor would I want you to feel what I feel. I wouldn't wish that upon anybody.
>
> DEFENSE COUNSEL: I don't have any other questions.

The prosecutor then began her cross-examination of Mr. Spicuzza:

> PROSECUTOR: So why is your daughter lying?
>
> MR. SPICUZZA: So I believe she feels that I have destroyed her social life.

PROSECUTOR: Why would she feel that?

MR. SPICUZZA: Because I told –

At that point, defense counsel objected, moved "to strike the question and the answer," and moved for a mistrial.

At a bench conference, the trial court commented:

Why is she lying? I don't think that's an inappropriate question to ask. He says she's lying. Why would she lie? I mean, it's a question she can ask him and he can say I don't know. But he didn't say I don't know. He said I believe she's – that he destroyed her social life. Follow-up question, why do you believe that?

In response, defense counsel argued that "the question itself should be stricken. It's an inappropriate, inadmissible question to ask another witness to comment on the thought process of another witness."

The prosecutor then interjected: "You just opened the door with the last question. He called her a liar. He just opened the door to that." The trial court replied, "That's exactly what happened," overruled the objection, and denied the motion for a mistrial.

**II**

I agree with the Appellate Court that the defense opened the door to the State's question, "So why is your daughter lying?", although my reasoning differs from that of the Appellate Court.

Irrelevant evidence is never admissible. Md. Rule 5-402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5-401; *see also Montague v. State*, 471 Md. 657, 695 (2020) ("The

3

relevance inquiry under Rule 5-401 sets out 'a very low bar' to the admissibility of evidence." (quoting *Williams v. State*, 457 Md. 551, 564 (2018))).

The "opening the door" doctrine allows for evidence to be admitted that the opposing party has made relevant that otherwise would have been irrelevant. *See, e.g.*, *Grier v. State*, 351 Md. 241, 260 (1998). "Incompetent evidence refers to evidence that is inadmissible for reasons other than relevancy." *Id.* at 261. As such, the "opening the door" doctrine does not permit a court to admit incompetent evidence. *Id.* at 260-61.

In general, testimony about another witness's credibility is inadmissible. *See* *Bohnert v. State*, 312 Md. 266, 278 (1988). This is because "the credibility of a witness and the weight to be accorded the witness' testimony are solely within the province of the jury." *Id.* at 277. This Court stated it is "error for the court to permit to go to the jury a statement, belief, or opinion of another person to the effect that a witness is telling the truth or lying." *Id.* Thus, "[w]hen prosecutors ask 'were-they-lying' questions, especially when they ask them of a defendant, they, almost always, will risk reversal." *Hunter v. State*, 397 Md. 580, 596 (2007).

Defense counsel asked Mr. Spicuzza at the end of his direct examination, "When you heard your daughter tell this jury all of those things that she said you did to her sexually, how did you feel? Tell the truth." Defense counsel did not ask Mr. Spicuzza if he believed H. was lying about Mr. Spicuzza having sexually abused her. Rather, defense counsel was asking Mr. Spicuzza about his feelings after having heard H.'s testimony. Despite the fact that Mr. Spicuzza had taken an oath to be truthful throughout his testimony, defense counsel specifically instructed Mr. Spicuzza to "[t]ell the truth" when describing

4

his feelings to the jury. In doing so, defense counsel specifically invited the jury to consider Mr. Spicuzza's answer in assessing his credibility. In essence, defense counsel was asking the jury to consider whether a person who truthfully denies sexually abusing their daughter would feel the way that Mr. Spicuzza claimed to feel upon hearing his daughter's false allegations.

In answering his attorney's question, Mr. Spicuzza described having feelings of disgust but went further, and said that H. had made a "vile, false statement":

> I – it – it's indescribable. I don't know if any of you have children, but I don't even think you could imagine what that feels like to sit here and listen to that. That is disgusting to hear that vile, false statement come from your daughter. I can't – I can't describe it. Nor would I want you to feel what I feel. I wouldn't wish that upon anybody.

Had the prosecutor objected and moved to strike the part of Mr. Spicuzza's answer that referred to a "vile, false statement … from your daughter" on the ground of relevance, perhaps the trial court would have instructed the jury to disregard it.

However, the prosecutor did not object. Instead, she began her cross-examination of Mr. Spicuzza by asking, "So why is your daughter lying?" Mr. Spicuzza answered: "So I believe she feels that I have destroyed her social life." Defense counsel objected and moved to strike the question and answer.

The Majority concludes that the trial court erred in not striking the prosecutor's question and Mr. Spicuzza's answer for two reasons. First, according to the Majority, the prosecutor's question was improper because it invaded the province of the jury to assess H.'s credibility. Second, the Majority opines that the question asked Mr. Spicuzza to speculate as to why H. was lying. That is, the question called for incompetent evidence in

5

the absence of the prosecutor first laying a foundation that Mr. Spicuzza had a basis to know why H. was lying.

The problem with the Majority's analysis is that it misapprehends the purpose of the prosecutor's question. The prosecutor's question was not probing H.'s credibility. When the prosecutor asked Mr. Spicuzza, "Why is your daughter lying?", it was not because she wanted to determine why H. was lying. Everyone understood that the State's position was that H. was *not* lying. It was clear that, instead, the prosecutor was probing Mr. Spicuzza's credibility. Thus, although the prosecutor phrased the question as "So, why is your daughter lying?", it was clear that, in essence, she was asking Mr. Spicuzza, "So, what is your theory about why your daughter is lying?" The prosecutor was exploring Mr. Spicuzza's theory as to why, if H.'s allegations were false and if Mr. Spicuzza and H. had maintained an appropriate father-daughter relationship, H. would make such a "vile, false statement" in court – a statement that, if believed, could land her father in jail for many years. Was she suffering from mental illness? Had false memories been planted in her mind during counseling?[3] Had H.'s mother or one of H.'s friends put her up to it because they

---

[3] H. testified that, between her second and third interviews with Ms. Moneymaker, she attended therapy. On redirect, she testified about why she did not tell Ms. Moneymaker, in the second interview, about her vaginal rape and sex toy accusations:

> At that time I had not remembered very clearly. I assumed he had done more stuff but I did not remember so I did not want to put it out there that he had done that without knowing for sure that he did.

> But with therapy and like talking about it had helped me like – like sometimes when severe trauma happens I block out things in my brain and I assume I did that with that because I didn't want him to like look like the bad

had a vendetta against Mr. Spicuzza? Or did H. have a reason of her own to be angry at Mr. Spicuzza that had nothing to do with sexually inappropriate conduct, given that (in Mr. Spicuzza's recounting of the events) no such conduct had occurred? If so, was H.'s anger toward Mr. Spicuzza related to her alleged protest of Mr. Spicuzza's decision to discontinue A.L.'s and I.H.'s overnight stays at his apartment – which Mr. Spicuzza had testified about a few minutes earlier on direct examination? Mr. Spicuzza seemingly understood the prosecutor's question to be asking for his theory or opinion about why H. was lying, as he answered, "So I *believe* she feels that I have destroyed her social life." (Emphasis added).

This case was all about credibility. As the prosecutor observed in her opening statement, "[t]his case is about … the jury weighing the credibility of the witnesses." The State had no forensic evidence to present, so witness credibility was central to the trial. This explains why, in his opening statement, Mr. Spicuzza's attorney cast H.'s accusations as "not true" and claimed that Mr. Spicuzza was "falsely and wrongly accused." It also explains Mr. Spicuzza's decision to testify, exposing, in his counsel's words, "his entire life and word and body" to the jury. When Mr. Spicuzza's attorney asked him to "tell the truth" about how he felt hearing H.'s testimony, defense counsel linked Mr. Spicuzza's feelings to his credibility as a witness. Defense counsel's focus on Mr. Spicuzza's state of mind upon hearing H.'s testimony as a measure of his credibility opened the door to the

---

guy in my brain. So I had, had had [my therapist] help me like talk about it and I'm a lot more open with it now and which has even helped me even more to remember things.

7

State asking Mr. Spicuzza other questions about his state of mind concerning H.'s testimony. None of this invaded the province of the jury to determine H.'s credibility.

For the same reasons, the prosecutor's question did not ask Mr. Spicuzza to provide incompetent evidence. It was clear from the context that the prosecutor was attempting to impeach Mr. Spicuzza by further exploring his subjective feelings and beliefs. As discussed, the prosecutor was not actually attempting to learn why H. lied. It is immaterial that the prosecutor did not first ask Mr. Spicuzza a foundational question to determine the basis for Mr. Spicuzza's theory for why H. was lying.

Justice Gould and Justice Eaves have authorized me to state that they join this opinion.

Circuit Court for St. Mary's County
Case No.: C-18-CR-22-000283
Argued: December 5, 2025

IN THE SUPREME COURT
OF MARYLAND

No. 25

September Term, 2025

BRIAN S. SPICUZZA

v.

STATE OF MARYLAND

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

Dissenting Opinion by Killough, J.

Filed: July 28, 2026

I respectfully dissent.  I would reverse.  The two legal errors that occurred in this case require it.  The *first* error is the trial court's admission of testimony that Mr. Spicuzza sexually abused H.'s friends and supplied them with intoxicating substances, as evidence of a common scheme or plan.  The *second* error is the trial court's admission of the "why-would-she-lie" question the State put to Mr. Spicuzza on cross-examination regarding his daughter's motives.  The Majority concedes that the second error occurred in this case.  But unlike the Majority, I believe that the error was not harmless.  Together, both errors were decisive, because this trial was a contest of credibility and very little else.

I.

The *first* error is the trial court's admission of propensity evidence in violation of Maryland Rule 5-404(b). The court allowed evidence of Mr. Spicuzza's uncharged crimes against H.'s friends, A.L. and A.B., accepting the State's argument that Mr. Spicuzza's conduct was part of a single, overarching plan to groom and sexually abuse H. and her friends alike.  I disagree.  Allowing uncharged wrongful acts under the guise of a "plan" on this record would sanction the routine admission of propensity evidence against virtually any repeat offender.

At trial, the State's theory of special relevance rested on an instrumental link: that Mr. Spicuzza used H.'s friends to lure and intoxicate her, subduing her to facilitate the abuse.  On that account, Mr. Spicuzza's conduct with A.L. and A.B. was the "means," and the abuse of H. was the "end."  The chronology established at trial forecloses that theory, and the Majority discards it.  Instead, the Majority recasts the State's theory at a higher level of generality—a single plan to groom and sexually abuse H. and her friends alike

using H. as the "nexus" for that scheme. But generality is not a cure for what is wrong with the State's case; it is the problem. The broader the asserted "plan," the less it distinguishes design from mere disposition.

The State failed to show there was a common scheme or plan. What it showed was Mr. Spicuzza's method of predation and a disposition to abuse the girls within his reach. The common scheme or plan exception to such evidence is not satisfied by mere connection or similarity. Two crimes may share an actor, a place, and overlapping people and still be two crimes. They form a single scheme only when each is a step toward one objective, so that "proof of one tends to establish the other." *Cross v. State*, 282 Md. 468, 475 (1978). The paradigm is the theft of nitroglycerine to blow a safe, *McKinney v. State*, 82 Md. App. 111, 124 (1990), the uncharged crime is admitted because it was "committed in order to effect the primary crime for which the accused has been indicted." *Cross*, 282 Md. at 476 (internal quotations and citations omitted). Another example is stealing a security badge on Monday in order to gain access to a building on Tuesday to rob it. Here, Mr. Spicuzza did not rape his daughter in order to abuse her friends. Nor did he commit his alleged uncharged crimes against A.L. or A.B. in order to rape his daughter. Mr. Spicuzza abused his daughter for years, before her friends appeared. And, importantly, H. was not a "nexus" who facilitated any abuse of A.L. or A.B.

H. testified that the abuse began while her father was still living with his parents, where he resided until February 2020. The abuse continued after he moved into his own apartment. However, A.B. did not spend time at that apartment until the summer of 2021—

2

more than a year later. A.L. did not arrive until New Year's Eve of 2021, staying for roughly six weeks before the defendant's arrest. Thus, the abuse of H. was well over a year old before either girl set foot in the apartment. On the State's own evidence, neither girl was present when the defendant abused H., and neither had firsthand knowledge of it.

The Majority contends "that a common scheme or plan need[] [not be] conceived at the outset of a defendant's criminal conduct for evidence of other subsequent bad acts in furtherance of such a scheme to be admissible." Maj. Slip Op. at 51. That is true, but beside the point—there must still be a plan. Whether a plan forms early or crystallizes midway, there must still be a design under which separate acts become steps toward a single end. Consider a defendant who sets out to break into a building, stumbles across an unattended security badge, and steals it to gain access; the theft of the badge becomes a step in the scheme. Here, no such moment exists because there is no unifying objective at all.

The Majority asserts that "[w]ithout H., Mr. Spicuzza would not have had access to these young girls so that he could groom and abuse or attempt to abuse them in the privacy of his apartment." *Id.* at 50. That statement is undoubtedly true—if they were not friends with H., Mr. Spicuzza would never have met them—but that does not make H. a part of any design or plan. It is also legally beside the point. It mistakes *access* for *design*, and *opportunity* for a *scheme*. Access explains how a predator comes into contact with potential victims; it does not transform distinct, independent acts of abuse into a single, integrated plan. A middle school teacher has access to students only through his employment, and a coach has access to players only through the team. Yet no court would

3

hold that abusing multiple students or teammates constitutes a "common scheme" merely because the position provided a shared point of entry. *See, e.g., McKinney*, 82 Md. App. at 123–24 (reversing the consolidated convictions of a volunteer camp counselor accused of sexually touching three campers entrusted to his supervision, because evidence of similar contact with a different child "would not tend to prove" a common scheme). H. was the connection through which Mr. Spicuzza met her friends. But serving as a point of access is not the same as participating in a unified criminal design. By treating a shared avenue of access as proof of an overarching plan, the Majority mistakes the venue for the blueprint—and in doing so, converts Rule 5-404(b) into a rule of automatic admissibility whenever a defendant targets victims within his social circle.

The Majority grounds its holding in *Cross v. State*, 282 Md. 468 (1978), asserting that a factfinder could view the abuse of A.L. and A.B. as "individual manifestations" of a "general plan to abuse H. and any other underage girls H. would bring to Mr. Spicuzza's apartment." Maj. Slip Op. at 51. This argument fundamentally misconstrues both *Cross* and the nature of a Rule 5-404(b) "plan."

A standing inclination to exploit "any girl" who enters an apartment is not a "plan"; it is a propensity. Under *Cross*, "individual manifestations" of a "general plan" refers to discrete, interconnected steps designed to achieve a specific, overarching end. 282 Md. at 475–76. It does not mean a generalized, open-ended intention to commit similar crimes against whoever happens to come within reach. To define a "plan" by such open-ended target selection collapses the boundary between character evidence and a common scheme.

4

The Majority highlights that Mr. Spicuzza repeatedly used the same tactics—vapes, alcohol, and pornography—to create a permissive atmosphere and lower the girls' inhibitions. But executing a consistent technique across independent incidents describes a *modus operandi*, not an integrated scheme. Showing that a defendant uses the same routine to target different victims on different occasions demonstrates a recurring method of operation—evidence that is strictly inadmissible to prove guilt under Rule 5-404(b) unless identity is at issue. *See Hurst v. State*, 400 Md. 397, 414 (2007) (explaining that propensity evidence is inadmissible under the *modus operandi* exception when it is not being admitted to identify the defendant).

Plying A.L. with vapes was not a step toward abusing H., nor did it advance any unified criminal scheme. It was simply an independent act of alleged misconduct carried out using Mr. Spicuzza's preferred method. Relabeling a recurring technique as a "general plan" to abuse "any girl" present allows the State to introduce pure character evidence under the banner of an exception, eviscerating the very protection Rule 5-404(b) was designed to preserve.

The Majority points to testimony that Mr. Spicuzza demanded fellatio from H. "in exchange for having her friends over[.]" Maj. Slip Op. at 50. Granting that testimony in full, it shows only that he held leverage over H. and exploited it to abuse her. The thing of value in that bargain was the friends' *presence*, not their *abuse*. The exchange ties the abuse of H. to the girls being allowed to visit; it says nothing of the girls being harmed. That he allegedly abused them once they arrived is a separate matter—it happened because

5

they were present, not because their abuse was the currency, object, or step toward anything else.

If anything, the record runs the opposite way. The friends' presence did not make the abuse possible; it is what brought the abuse to light. A.L. told her mother in February 2022, and the arrest followed within weeks. There is thus no "causal relation or logical or natural connection" among these acts, *State v. Jones*, 284 Md. 232, 244 (1979), nor is there a "single inseparable plan encompassing both the charged and uncharged crimes," *Cross*, 282 Md. at 476 (internal quotations and citation omitted).

The Majority correctly recognizes that the personal relationship among victims does not mark the line between inadmissible propensity evidence and a common scheme under Maryland Rule 5-404(b). Instead, invoking *Bell v. State*, 234 Md. 254 (1964), the Majority seeks "a nexus . . . beyond similarities—with one of the victims playing a role in facilitating the abuse of another[,]" finding that nexus satisfied because H. brought her friends into the home. Maj. Slip Op. at 48–49. That reasoning, however, conflates physical opportunity with a common criminal plan. In *Behrel v. State*, 151 Md. App. 64 (2003), the defendant utilized church youth activities to establish proximity to his victims, yet the Appellate Court concluded that this channel of access did not bring the secondary victim's testimony within the common scheme exception. *Id.* at 131–32. Similarly, in *McKinney*, an outdoor education program provided the vehicle through which the defendant reached his victims, but those parallel opportunities were likewise held insufficient to establish a common scheme. 82 Md. App. at 124. Every serial abuser has some means of reaching victims; if a shared point of access created a common scheme, the exception would consume the rule.

6

As the Appellate Court explained in *Reidnauer v. State*, 133 Md. App. 311 (2000), "[e]ven though the evidence indicates that the sexual assaults committed in this case were perpetrated in a similar manner, the similarities do not establish that the offenses were part of a common scheme." *Id.* at 321.

Nor does *Bell* bear the weight the Majority places on it. The nexus in *Bell* was of a wholly different kind. There, the older sister took "an active part in the seduction of the younger[,]" conduct so intertwined that one victim's abuse could not be described without the other's. 234 Md. at 258–59. That is active participation in the charged episodes themselves, not the mere furnishing of access. H. supplied nothing of the sort. She was not present when her friends were abused, they were not present when she was, and she neither witnessed nor participated in any abuse of A.L. or A.B. To read *Bell*'s "facilitating" to reach a victim who did no more than bring her friends within his reach is to erase the very line *McKinney* and *Behrel* drew. Such a rule guts the limits Rule 5-404(b) places on evidence of other crimes, wrongs, or act; any victim who introduces a friend to a relative, coach, chaplain, or camp counselor becomes a "nexus," and every parallel crime a common scheme.

Stripped of its label, the State's evidence is pure propensity: the defendant did these things to his daughter's friends, so he must have done them to his daughter. That is the exact inference Rule 5-404(b) exists to prevent. It is the same inference we declined to license in *Hurst*, in which we explained that any change to the propensity rule must come from the General Assembly or our rulemaking capacity. 400 Md. at 418. The General Assembly answered that call by enacting Md. Code Ann., Cts. & Jud. Proc. ("CJP") § 10-

7

923, attaching strict conditions for admitting prior sexual misconduct involving different victims.  The common scheme exception is not a vehicle to bypass those statutory conditions.[1]

## II.

The *second* error is the "why-would-she-lie" question.

I agree with the Majority that the State's question—"So, why is your daughter lying?"—was impermissible as a matter of law, and that the opening-the-door doctrine has no application to it.  *See* Maj. Slip Op. at 54–58.  Opening the door is a rule of relevance. It admits competent evidence that an opponent's proof has made relevant; it has never admitted evidence that is incompetent for reasons apart from relevance.  *Grier v. State*, 351 Md. 241, 260–61 (1998); *Clark v. State*, 332 Md. 77, 87 (1993).  A "why-is-she-lying" question is incompetent for reasons that have nothing to do with relevance—it hands the jury's own function to the witness, and it calls for pure speculation.  *Hunter v. State*, 397 Md. 580, 588–89 (2007); *Bentley v. Carroll*, 355 Md. 312, 338 (1999).

That agreement is where the Majority's path and mine separate.  An error that goes to the very determination on which the case turned—whether to believe H. or Mr. Spicuzza—is not one I can call harmless.

---

[1]  Because I would hold the evidence inadmissible as common-scheme proof, I would also reject any affirmance resting on the delayed-disclosure theory the State first advanced on appeal.  The probative value of other bad acts evidence depends on the contested issue for which it is offered and on how the trial actually unfolded, and Rule 5-403 commits that weighing to the trial court.  An appellate court may not perform it in the first instance. *See North River Ins. Co. v. Mayor & City Council of Balt.*, 343 Md. 34, 47–48 (1996).

8

## III.

The State bears the strict burden of establishing, beyond a reasonable doubt, that an error "in no way influenced the verdict[.]" *Dorsey v. State*, 276 Md. 638, 658–59 (1976). In reviewing a cold record, we are not permitted to find facts or re-weigh credibility to save a tainted conviction. *Bellamy v. State*, 403 Md. 308, 332 (2008). Reversal is mandatory unless the State can exclude the possibility that the error played any role whatsoever in the jury's rendition of guilt. *Id.* The State cannot carry that heavy burden here.

The Majority concludes that this error satisfies the high threshold for harmlessness because Mr. Spicuzza had already labeled H.'s claims a "vile, false statement" on direct examination. Maj. Slip Op. at 59. If the State believed Mr. Spicuzza's direct testimony exceeded permissible bounds, its remedy was to object and move to strike. Its failure to object does not license cross-examination that our cases squarely prohibit.

Nor can the error be excused on the ground that Mr. Spicuzza's response was "innocuous." *Id.* When forced by the prosecutor to explain why his daughter would fabricate a claim of rape, Mr. Spicuzza posited that "she feels that I have destroyed her social life." The Majority observes that the defendant was not caught flat-footed and managed to offer a motive. This misconstrues the *Dorsey* standard. Harmlessness is not measured by whether the defendant kept his composure under an improper question. The harm is embedded in the improper question itself.

By forcing the defendant to provide a reason for his accuser's fabrication—which the Majority admits was error—the State executed an impermissible burden-shifting maneuver. The question signaled to the jury that a complaining witness's testimony must

9

be accepted as true unless the defense can diagnose and prove the witness's psychological motive to lie. Mr. Spicuzza was placed in the impossible position of either failing to provide a plausible motive for his daughter's fabrication—which the Majority acknowledges would have been damaging—or providing a motive that sounded utterly trivial when weighed against an allegation of sexual assault. To tell a jury that a daughter fabricated a rape charge because her father "destroyed her social life" is a catastrophe for any defendant. The question forced Mr. Spicuzza to offer an absurdly disproportionate justification for his daughter's accusation to prove his own innocence.

The central question in this trial was a pure credibility contest. Mr. Spicuzza denied everything. The case turned entirely—as it did in *Bohnert v. State*, 312 Md. 266 (1988)—on "the jury's determination of the credibility of two witnesses, the accuser and the accused[,]" *id.* at 273.

Both errors bore on that delicate credibility determination, and it cannot be said that the errors did not influence the jury's verdict of guilty. The inadmissible other bad acts evidence told the jury that Mr. Spicuzza is the kind of man who preys on teenage girls. The "why-would-she-lie" question told the jury that unless he could supply a compelling reason for H. to lie, her testimony must be true. Between them, the two errors stripped Mr. Spicuzza of the presumption of innocence and implicitly transferred the State's burden of proof onto his shoulders.

The limiting instruction did not cure the prejudice of the evidence admitted as evidence of a common scheme and plan. The jury was told it could consider the pornography and the intoxicating substances "only on the question of common scheme or

10

plan." But as demonstrated above, no such scheme existed—not at the outset, and not later. Directing a jury to use highly prejudicial evidence for a conceptually non-existent purpose does not cabin its impact; it merely highlights for the jury the existence of the improper evidence. To tell a jury they may look at prior bad acts only to find an impossible plan is not a limitation—it is a spotlight.

Finally, the Majority deems the improper "why-would-she-lie" question harmless in light of the "otherwise overwhelming evidence" against Mr. Spicuzza. Maj. Slip Op. at 59–60. But the evidence looks overwhelming only because it counts A.L.'s and A.B.'s testimony among the proof. I would not. Set that testimony aside, and what remains is H.'s account, denied in full by Mr. Spicuzza. One cannot build an "overwhelming evidence" argument on the very testimony that should not have been admitted in the first place; a reviewing court may not use the weight of erroneously admitted evidence to prove that a separate error was harmless.

Nor was A.L.'s testimony cumulative. She alone described waking in the night to find Mr. Spicuzza attempting to sexually assault her, freezing, retreating to another room, and being coaxed back toward his bedroom. No other witness said anything like that. A.L.'s testimony was the most inflammatory evidence the jury heard outside of H.'s own testimony—and it detailed a new, uncharged crime involving A.L. as the victim for which Mr. Spicuzza was not on trial. Indeed, this is precisely the prejudice that accompanies the improper admission of other victim testimony; the Appellate Court recognized in *McKinney* that any trier of fact "who might doubt one child's testimony about the type of

conduct ascribed to [the defendant] would be more likely to believe it if other children testify to similar acts." 82 Md. App. at 128.

I would reverse and remand for a new trial. The General Assembly has enacted CJP § 10-923, and at oral argument the State contended that the alleged common scheme and plan evidence could have been admissible under that statute. Perhaps it could be. That is a determination for the trial court to make in the first instance, on a proper motion, under the standards set forth in CJP § 10-923. It is not a determination for this Court to make after the fact, under an evidentiary exception that does not fit.

Respectfully, I dissent.